SCOTT *v.* BOYNE CITY, GAYLORD & ALPENA RAILROAD CO.

MASTER AND SERVANT—RAILROADS — NEGLIGENCE — BRAKEMAN —
DEFECTIVE SWITCH.

> Where plaintiff claimed that decedent, a brakeman, was killed by catching his foot in a defective blocking of defendant's switch, and was run over by its freight train that he was trying to board, but the evidence left it a matter of conjecture whether he caught his foot in the blocking or in the spaces between the ties, which were cleared out and remained unballasted, leaving numerous places where his foot might have caught, the question of defendant's negligence in failing to provide sufficient blocking should not have been submitted to the jury.[1] MOORE, C. J., and BLAIR and BIRD JJ., dissenting.

Error to Otsego; Sharpe, J. Submitted February 14, 1911. (Docket No. 166.) Decided March 29, 1912. Rehearing denied June 1, 1912.

Case by Samuel Scott, administrator of the estate of Frank D. Gibbs, deceased, against the Boyne City, Gaylord & Alpena Railroad Company for the negligent killing of plaintiff's decedent. Judgment for plaintiff. Defendant brings error. Reversed.

*Harris & Ruegsegger* (*Rollin H. Person*, of counsel), for appellant.

*De Vere Hall*, for appellee.

McALVAY, J. Plaintiff, as administrator, brought suit for damages against defendant for negligence in causing the death of Frank D. Gibbs, who at the time of his death was employed by defendant as a brakeman upon a logging train operated by it upon its railroad. This railroad is largely engaged in the transportation and delivery of saw-

[1] Liability of railroad company for injuries to servants owing to want of blocking at switches, see note in 16 L. R. A. (N. S.) 715.

logs and other forest products for the owners of the same, who operate mills where such products are manufactured at Boyne City. The logs from the woods are transported on what are called "Russell" cars, which are cars consisting of two sets of trucks connected by timbers called "leaders," each seven by eleven inches, across which are short heavy timbers called "bunks," to support the logs. At each end of these cars the leaders extend beyond the bunks three or four feet, and to these the drawbars and car couplings are attached. Across the ends of the leaders is a timber called the "brake hanger beam," from which the brake beam is hung by iron rods. The brake beam, from six to eight inches square, which carries the brakes, hangs down back of the wheels, and extends clear across from outside to outside of the wheels, with the lower side less than six inches from the tops of the rails.

Plaintiff's decedent was employed by defendant as a brakeman during the spring of 1909, and continued such work until the accident on June 2d following. He was an experienced brakeman, well acquainted with the manner in which these logging trains were handled, and the manner in which the cars were switched in at the different sidings.

Defendant's road enters Boyne City from the east, and in the eastern part of the city there is a switch, known as the "cooperage switch," leading into a sawmill known as "Mill Three," and also to the plant of the Elm Cooperage Company. There is a downgrade towards the west on the main line where this switch is located, and heavy trains from the east intending to back in on this switch, to get speed enough, must run past the switch some distance on the upgrade east of it. A telephone system is used by defendant for dispatching its trains.

On the day of the accident, a logging train, consisting of 19 of these cars, loaded with sawlogs, was running towards Boyne City from the east. The crew consisted of the conductor, engineer, fireman, and brakeman Gibbs, plaintiff's decedent. At a telephone station about 10 miles

east of Boyne City, the conductor reported, and received orders to set out certain cars of this train at the unloading place on the siding beyond this switch.  He communicated this order to Brakeman Gibbs, who remained on the end of the train, and then the conductor walked forward to the engine to give the engineer the order, and rode on the engine until he came to this switch, where he got off on the south side to throw the switch for the train to go in on the siding.  When the end of the train came to the switch, Brakeman Gibbs also dropped off, saying, as he saw the conductor, that he did not see him get off. The conductor threw the switch and started to walk in on the siding towards the place where the cars were to be left, so as to be in position to signal the brakeman and control the movement of the train when it came in.   This siding leaves the main line on the north side of the track and, curving northeasterly, runs so that some sheds obstruct the view from the engine to the place where cars are to be left, making it necessary to have a brakeman about the middle of the train to receive the signals from the conductor and give them to those in charge of the engine.  Plaintiff's decedent waited for the train to come back, standing on the north side of the track not far from the switch.   The exact place is not fixed.   It is evident that his purpose was to get onto the train while in motion in order to get into position to take signals from the conductor.   While standing there he was seen by two persons.   One, a girl about 12 years old, saw him standing opposite the switch on the north side of the track signaling the train while it was backing up, and saw no more after the train cut off her view.   She was on the back porch of her father's house on the south side of the railroad about 20 rods away.   The other person was a man named Betterly, who testified that from the porch of his house about 16 rods south from the track, across a street and some vacant lots on which grass and weeds grew a foot or 18 inches high, he saw Gibbs standing on the north side of the track outside of the ties east of the

switch, but could not give the exact place. He says:

"Just at the right of the switch, between the switch and the blocking. When the middle of the train which was backing from the west came to him, he undertook to get on. He went to step in there to get on between the cars. As near as I can see, he took hold of this brake hanger beam and he straightened right out."

He could not see decedent's feet from where he was, but saw him disappear. He further says:

"I didn't know that he had got caught. I didn't know but what he had caught on. Didn't occur to me that anything had happened to him until after the train had got over him and I seen him there."

This is the substance of all the testimony of the witnesses of what they saw just prior to and at the time of the accident.

The switch is what is called a "split switch." It is a standard switch in use by railroads. Such a switch is constructed with movable points, which are both inside and between the rails of the main line. The movable ends of these points are held in position by iron bars called a "bridle." In this case the west ends of the points, being the sharp points, were bolted to the first switch bar attached to the switch stand, and the second bridle bar, about two feet east, was also bolted to the points. These points are sections of steel rails which are beveled on the side next the lead rail to a sharp point, and at this switch with joints at the east ends by which the north point is attached to the north rail of the main line, and the south point to the south rail of the siding track. When this switch is so operated as to throw the points north, it is set for the main line; when thrown south, as on this occasion, the switch is set for this siding upon which this train was backing. There is a target on the switch stand which informs the engineer for which track the switch is set. When this switch was set for this siding, it was thrown south, and the north point was $5\frac{1}{2}$ inches from the inside of the north rail of the main track, and the south point was close against

the inside of the south rail. In split switches the throw rails of necessity cannot be blocked, because the points must be brought close against the lead rail on whichever side it is thrown. Such switches are only blocked at the places between the siding rails and the main line where the movable throw rails are attached. At this point on the north side of the main track there was a block three feet long driven in between the diverging rails from the east as far as possible up to the east end of that switch point. This is the only blocking used in split switches.

After the disappearance of Gibbs from the view of witness Betterly, the train, which was going at the rate of five miles an hour, continued to back in on the siding, and when the body of Gibbs was discovered it stopped and blew two whistles for the conductor. The body was cut in two, square across at about the hips. The trunk of the body was lying north of the north rail of the siding at right angles with the north rail of the main track. It was 15 feet east of the blocking above described, and 30 feet east of the switch. The lower part of the body was lying nearly at right angles with the rails about the middle of the main line track 6 feet farther east than the trunk. The left shoe was found in the middle of the main track not far east from the blocking. The shoe string was broken and but little of it left. The "upper" of the shoe on the left side near the back of the heel was started from the heel, upon which were marks evidently caused by pressure and the stiffening above the heel was bent over to the right. There was grease on the opposite side of it. Otherwise the shoe was not injured. The doctor who was present before the body was moved, on direct examination by plaintiff, among other things, testified relative to the condition of the left foot, as follows:

"There was a slight contusion on the left foot. There was no crushing. There was a slight bruising, not much discoloration, just a slight bruising on the outer surface of the foot from the external malleolus (ankle bone) extending towards the small toe.

"*Q.* Well, you know what a car wheel is?

"*A.* Yes.

"*Q.* Had anything run over the foot so as to crush it there, or was it merely pressed and bruised?

"*A.* I would never consider, in my experience with railroad accidents, that a car wheel could have run over it, because it would have amputated it entirely with a load of logs on."

The record shows that brakemen were in the habit of getting on these trains when in motion by stepping onto the brake beam and taking hold of the brake hanger beam to get up on the leaders. The record shows without dispute that split switches are considered dangerous for brakemen to go over.

During the trial, when defendant was undertaking to show that the movable throw rails of the split switch could not be blocked, the following colloquy took place, after a remark by the court:

"*Counsel for Defendant:* That may be true, your honor, but I want to get in the record whether or not a block could be put in there the whole distance.

"*By the Court:* Counsel on the other side conceded that it could not be. * * *

"*By Mr. Hall:* Well, we plant our case upon the fact that the foot was caught at the block upon the north side of the track. * * * If it didn't catch there, this plaintiff doesn't ask for a verdict."

The case proceeded upon that theory and claim. Testimony was introduced tending to show that the blocking referred to was in such a condition, on account of being slivered off at the west end, that a foot could slip in between the blocking and the ball of the rail and be held fast. At the conclusion of the evidence, defendant requested a verdict to be directed in its favor, on the ground that the proofs do not show that decedent was injured by catching his foot in this blocking, and that it is a pure conjecture how the accident occurred, and also that decedent was guilty of contributory negligence. The motion was denied and exceptions taken. The case was submit-

ted to the jury under the charge of the court. A verdict was returned against defendant. A motion for a new trial based upon the same grounds as the motion for a directed verdict, and also for refusing certain requests to charge, was made and denied, to which denial defendant excepted.

The principal errors assigned before this court relate to the questions first raised upon defendant's motion for a directed verdict, and it will not be necessary to consider any others.

It is insisted by appellant that the exact cause of the accident was not proven, and the jury was allowed to speculate and guess at it. The motion on the part of the defendant for an instructed verdict was urged upon the ground that the proofs did not show that the decedent's foot was caught in the blocking; that from such proofs it was a pure matter of conjecture as to how the accident occurred. The plaintiff urges the contrary of this proposition. The dispute, apparently, is not what the law is upon the question involved, but upon what the proofs presented by this record show.

Up to the time that plaintiff's decedent undertook to get on the moving train, there does not appear to be any dispute as to what had occurred. It will therefore be unnecessary to repeat the facts up to that point. The exact place where he stood at this time is not definitely fixed. Betterly and the girl Biskie are the only witnesses who saw decedent standing near the switch on the north side of the track. The girl attempts to give no definite place. Betterly's testimony places decedent near to and at the right of the switch between the switch points and the defective blocking. He says he saw him swing in west of this blocking, and his testimony indicates that he thought he was about half way between the switch and the blocking. He continually modifies his statements by saying that he cannot tell exactly where he stood. It is without dispute that the distance between the switch and blocking was about 15 feet, and also that between these two points

the earth under the rails and between the ties was all cleared out so that the ties there were as if laid on the ground with the rails fastened on top of them, which condition was necessary to safely operate a split switch. It is also undisputed that for this distance the switch point on that side of the track was thrown to the south, leaving between such point and the north rail of the siding an opening 5½ inches wide at the west end of the movable point, and the 3½ inches at its east end. The undisputed facts show that between the west end of this switch point and the claimed defective blocking there were 21 places into which the foot of a person attempting to board a train at that place might be caught as in a trap, not counting the defective blocking where plaintiff insists decedent's foot was caught. The only testimony in the case as to where decedent stood when he attempted to board the moving train is that of the witness Betterly, who placed him half way between the switch stand and the defective blocking. In that distance, at some unknown point of which he crossed the rail, there were 12 places exclusive of the defective blocking into which his foot could have been caught. The conclusion from this record is forced upon us that the evidence did not warrant the court in refusing to grant defendant's motion for a directed verdict. The cause of the accident was not proven, and the jury were allowed to speculate and guess as to such cause.

Plaintiff has rested his case upon the claim that decedent caught his foot at the defective blocking. If the foot was caught at any place, which we do not determine, it is from this evidence as probable that it was caught before he reached the defective blocking, and while he was passing over this gridiron of holes, the presence of which was not only not negligence, but a necessity in case of a split switch.

The law is well settled that a case should not be submitted to the jury where a verdict must rest upon a conjecture or guess. *Fuller* v. *Railroad Co.*, 141 Mich. 66

(104 N. W. 414); *Powers* v. *Railroad Co.,* 143 Mich. 379 (106 N. W. 1117).

Plaintiff urges that the finding of decedent's shoe in the middle of the track opposite the defective blocking, and the mark on it as if crushed by the flange of a wheel, and grease upon the opposite side of it, tended to show that it was caught at the blocking. The foot was not crushed, only bruised at the left ankle bone. If the shoe was caught at the blocking and crushed by the car wheel, the foot was not then in the shoe. The evidence shows that it would have been crushed. If the foot was caught at any of the other places, the shoe might have been marked and the foot not crushed, for the reason that there would be nothing like solid blocking under the foot to keep it up against a crushing wheel. The other places were all open to the bottom of the ties.

From the foregoing it clearly appears how and where the injury occurred is a matter of pure conjecture. To further illustrate, the record contains no direct evidence that decedent came to his death by reason of catching his foot in any of the numerous possible ways suggested. His body was found cut in two by the car wheel, square across at the hips; the head and trunk lying outside the north rail, and the lower portion inside, both at right angles with the rail. From this it might be reasonably inferred, not that his foot was caught and he was dragged from his hold on the brake hanger, but that his feet on the brake beam slipped to the south and his body fell square across the north rail. It would be a reasonable inference that the body stretched lengthwise with the rail, if caught and crushed by the wheel, could not have been cut square across at the middle.

The instant case is distinguishable from *Parker* v. *Union Station Ass'n,* 155 Mich. 72 (118 N. W. 733). In that case no one saw the accident, and defendant claimed that the proximate cause of the accident was entirely conjectural. A brief quotation from the opinion

169 Mich.—18.

will make apparent the point upon which the case turned:

"Plaintiff's theory was that, while engaged in performing his duties as switchman, decedent's foot was caught in a guard rail by reason of defective blocking, and that he was run over before he could extricate it. Defendants contend that the proof conclusively shows that just prior to his injury he was riding on the footboard of the locomotive, and that it is as reasonable to suppose that, in changing from one side of the engine to the other—of which there was some circumstantial evidence—he fell off from the footboard, and was run over, as that he stepped into the dangerous and defective place, and therefore that the cause of the accident is conjectural. Assuming that this was all of the testimony, we are of the opinion that this would be true; but it is not all. There was testimony that, when decedent was found, his foot was firmly wedged in the space between the guard rail and the main rail, the sole and heel pressed down flat."

In answer to defendants' contention "that it was as reasonable to suppose that the flange of the wheel pressed his foot in there, as that he stepped into it and was caught before being run over," the court quotes at great length from the testimony relative to the position and condition in which decedent's foot was found, after which the court says:

"While it is true that proof must establish a probability, and where the testimony can be said to be as consistent with a theory that relieves a defendant from liability for accident, as it is with one involving his liability, there can be no recovery, we have often held that circumstances shown may justify inferences which bring liability within the realm of probability, rather than leaving it a matter of conjecture merely."

No new rule of law was declared in that case. It was held that the evidence warranted its submission to the jury because, in the opinion of the court, legitimate inferences might be drawn from it which would bring liability within the realm of probability, rather than leaving it a matter of conjecture merely. No such legitimate inferences can be drawn from the evidence in the instant case.

The instant case is also distinguishable from the case

of *Erie Railroad Co.* v. *White,* 187 Fed. 556, 109 C. C. A. 322, a recent Federal case, in which Judge Denison wrote the opinion of the court. The negligence charged was a deficiently blocked guard rail. One shoe was found near the guard rail, and its broken lacing indicated that the foot had been torn out while the shoe was held fast. There is nothing to indicate that there was any evidence tending to show that there was any other place except the one defective blocking where decedent's foot might have become caught. The court says, "the action was brought and the judgment rendered upon the theory that the blocking was deficient, and decedent's foot was caught in it while walking between the cars endeavoring to open the coupling," and held that under the evidence the case was properly submitted to the jury.

Our conclusion is that the trial court was in error in denying the motion of defendant for an instructed verdict upon the ground discussed

The judgment of the circuit court is reversed, and a new trial ordered.

Steere, Brooke, Stone, and Ostrander, JJ., concurred with McAlvay, J.

Blair, J. (*dissenting*). I am unable to concur in the opinion of Justice McAlvay that the cause of the accident was purely speculative. This is not a case for the application of that doctrine but for the application of the rule that, "where different inferences may be drawn from the same facts, it is the province of the jury to draw such inferences, and not of the court." *Brunelle* v. *Ruell,* 140 Mich. 256 (103 N. W. 602).

According to the measurements made by Mr. Van Auken:

"From south bar to west end of block I measured with a square 13 feet and 8½ inches. Width between rails, west end of block, 3¾ inches. West end of block is on seventh tie from the switch beginning easterly, or long switch tie, being No. 1. Ties stick out north side of rail, counting

from the switch east No. 1 tie. That is the first tie from the long tie where the bar is, counting toward the block. The first tie, No. 1, stuck out 15½ inches from the rail; No. 2, 16 inches; No. 3, 13½ inches; No. 4, 15¼ inches; No. 5, 15 inches; No. 6, 14½ inches; No. 7, 14¾ inches. That is as far as I counted them. That brought you to the block. Distance from the bottom of the rail to the ground, measuring on the north side of the rail between the ties, between No. 1 and No. 2, 6 inches; between No. 2 and No. 3, 5½ inches; between No. 3 and No. 4, 4 inches; between Nos. 4 and 5, 4½ inches; between Nos. 5 and 6, 2½ inches; between Nos. 6 and 7 it was level. This level part was opposite the block. * * * I don't remember measuring how much the blocking was below the lower ball of the rail. I put my foot on or in there. I have done it on quite a good many occasions. I did on the first day I was there and on the second, and the conditions were the same each time. I placed myself in a position facing the east and stepped as though I was stepping hastily and aimed my foot at the same time to go in that place and springing forward, and my foot would catch each time between the blocking and the rail."

According to the testimony of Mr. Betterly and his location of the place where Gibbs stood by the red cross marked by him on plaintiff's Exhibit 1, he stood about opposite the fifth tie from the switch bar. The train was backing past him, and, naturally, he would step in moving with the train. When he stepped in he caught hold of the brake hanger beam, and at once his body straightened out as though his foot was held. Betterly illustrated to the jury the position Gibbs' body assumed, as nearly as he could.

The coroner testified:

" The left shoe was about opposite that block and between the rails. No part of his body or clothing was between this blocking and the switch stand. The nearest object to the blocking was his left shoe. The shoe was between the rails of the main line and about opposite of the block. * * * The heel of the left shoe was bruised. The left shoe had been torn off the foot. The foot was bruised from being twisted outward from the external malleolus to the little toe, blueish color. * * *

"*Q.* And you notice the shoe lace there is almost en—
"*A.* That appeared to be cut.
"*Q.* What is that?
"*A.* They were all severed.
"*Q.* At that time?
"*A.* At that time.
"*Q.* Well, will you say there was just about as much shoe string left when you saw it as appears here?
"*A.* It looks like that. * * * The legs were about 36 feet from the switch—I mean the crossbar connecting the rails. The body was about 30 feet from the switch, and the shoe about 14 feet. The block was 14 feet and the shoe was right opposite the block. The shoe lay about opposite the block between the rails of the main line and the switch. * * * When I speak of the shoe being torn off, I mean it was off, and the shoe was bruised, and that is why the entry was made. The laces appeared just as they are in that shoe now. They appeared to be either torn or cut."

The only reasonable inference from Betterly's testimony is that decedent's foot was caught and held between the north side track rail and the north throw rail. At least, the jury were warranted in drawing such an inference from his testimony. The important question then presented was: Where was the foot caught? The defendant's witness Randall, the engineer of the train in question, testified:

"The danger of getting the feet caught is where the guard rails are or cross-rails. Where a person has to step over the rail running in there to step on a car, if you have to step over a switch rail, there is a chance there of obstruction. There isn't very much danger of getting caught between the ties, although there is a chance for a person to stumble there. * * * If a man went in between those cars to get on the leaders between those Russell cars, he would choose a clear place—a clear footing—because he would have to make a few steps in order to get on."

Betterly's testimony eliminates stumbling from the case, and Randall's testimony would warrant the jury in finding that it was not probable that his foot was caught between the ties. In fact, the whole case indicates that his

foot was caught between the fixed and the movable rail. Gibbs stood some four or five feet west of the west end of the block; his shoe lay about opposite the east end of the block, which was three feet long. Somewhere within this seven or eight feet the foot was caught. Unless it was caught within the four or five feet west of the west end of the block, then it was caught over the block, where Van Auken's experiments clearly demonstrated it would be likely to be caught if Gibbs stepped there. In stepping in he would step with the moving train. According to Randall, a man would take two or three steps. The train was moving four or five miles an hour, and a step or two would take Gibbs to the block. The shoe was a conclusive witness that he had not passed the block before he was caught. The shoe and the foot were potent witnesses that the foot was caught; that Gibbs tore his foot loose from the shoe, bursting the strings, before the following wheel caught his foot; and that the shoe was then forced in about two feet towards the center of the track. The train was moving east. The flanges of the wheels on the north side were against the inside of the north fixed rail. The blocking extended to the south some three inches. The drag of the train, the efforts of Gibbs to release his foot, the flange of the wheel crowding his foot to the south, when the foot came loose, threw his feet to the south, and the flange pushed the shoe in the same direction. The trap was set to catch a man's foot. Van Auken demonstrated that the trap was in good working order. The man's foot had the appearance of having been caught in the trap. His shoe bore plain marks of having been caught in the trap, and, furthermore, the shoe lay beside the trap. It appears to me to be a very reasonable inference from the facts that the foot was caught in the trap. As said at the beginning, this is not a matter of guesswork or speculation at all, but merely the ordinary case upon circumstantial evidence of drawing reasonable inferences from proven facts.

In my opinion, the inference which the jury drew is by

far the most reasonable and probable inference which the facts will admit of, and the jury deal with probabilities and not with certainties.

The evidence was in conflict as to whether the deceased was negligent in trying to mount the car at the particular place chosen by him, and the evidence warrants the conclusion that except for the negligence of the defendant he would have safely boarded the train. I think, therefore, that the court did not err in refusing to instruct a verdict on the ground of contributory negligence.

The other questions raised do not seem to me to present prejudicial error, and in my opinion the judgment should be affirmed.

MOORE C. J.. and BIRD, J., concurred with BLAIR, J.