SHIVERS v SCHMIEGE

Docket No. 284635. Submitted July 14, 2009, at Detroit. Decided September 29, 2009, at 9:00 a.m.

John Shivers brought a medical malpractice action in the Saginaw Circuit Court, Robert L. Kaczmarek, J., against Susan Schmiege, M.D., and Valley Anesthesia, P.C. (hereafter defendants), and others. The jury awarded past and future economic and noneconomic damages, and the court entered a judgment in favor of plaintiff. Defendants appealed from the denial of their motion for judgment notwithstanding the verdict or a directed verdict.

The Court of Appeals *held*:

1. Plaintiff's testimony and that of certain doctors and nurses provided a basis from which to infer that it would have helped more if the emergency decompressive cervical laminectomy that was performed on plaintiff had been performed earlier. The evidence was sufficient to allow the jury to infer that Dr. Schmiege was negligent in her treatment of plaintiff and that her failure caused a delay that cost plaintiff the use of his arms.

2. Plaintiff failed to present evidence that the jury could use to calculate the award for future economic damages. Plaintiff's counsel's reference to attendant care services was a suggestion regarding how to calculate noneconomic damages. The order denying the motion for judgment notwithstanding the verdict must be reversed and the award for future economic damages must be vacated.

3. The trial court did not err by concluding that plaintiff's loss of the functional use of his arms met the requirements in MCL 600.1483(1) for the application of the higher cap on the amount of noneconomic damages.

4. The trial court properly applied the cap on the amount of noneconomic damages that was in effect at the time the verdict was rendered, instead of the one in effect at the time the complaint was filed.

5. The trial court did not err by declining to apportion the cap to proportionally reduce plaintiff's damages for both past and

future noneconomic damages. It is proper to apply the cap to reduce the award for future damages first.

Affirmed in part, reversed in part, and award for future economic damages vacated.

SERVITTO, J., dissenting in part and concurring in part, dissented with regard to the majority's conclusion that plaintiff's counsel's reference to attendant care services was a suggestion regarding how to calculate noneconomic damages. There was no clear distinction between economic and noneconomic damages in counsel's argument. The record supports the conclusion that there was evidence upon which the jury could base its award of future economic damages for attendant care services. The trial court's denial of defendants' request for judgment notwithstanding the verdict should be affirmed. Judge SERVITTO agrees with the majority opinion in all other aspects.

1. DAMAGES — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES CAP — WORDS AND PHRASES — LIMBS.

   Application of the higher cap on damages for noneconomic loss in a medical malpractice action where the plaintiff is hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of one of more limbs caused by an injury to the spinal cord requires that two conditions be met: hemiplegia, paraplegia, or quadriplegia and a resulting loss of limb function; the terms "hemiplegic, paraplegic, or quadriplegic" do not describe the plaintiff's symptoms (i.e., the inability to use a limb) but, rather, the injury (i.e., a particular kind of damage to the nervous system); in addition to the injury, the plaintiff must exhibit the particular symptom of a total permanent functional loss of one or more limbs; the limbs in question may be arms (MCL 600.1483[1][a][ii]).

2. DAMAGES — MEDICAL MALPRACTICE — NONECONOMIC DAMAGES CAP.

   The cap on damages for noneconomic loss in medical malpractice actions should be applied to reduce future damages first and need not be applied proportionately to past and future noneconomic damages (MCL 600.1483[1]).

*Karl J. Weyand, P.C.* (by *Karl J. Weyand, Jr.*), *Lawrence J. Acker, P.C.* (by *Lawrence J. Acker*), and *Mark Granzotto, P.C.* (by *Mark Granzotto*), for plaintiff.

*Collins, Einhorn, Farrell & Ulanoff* (by *Deborah A. Hebert*) for Susan Schmiege, M.D., and Valley Anesthesia, P.C.

Before: OWENS, P.J. and MURRAY and SERVITTO, JJ.

OWENS, P.J. In this medical malpractice case, defendants Susan Schmiege, M.D., and Valley Anesthesia, P.C. (hereafter defendants), appeal as of right from a judgment following a jury trial wherein the jury found in favor of plaintiff and awarded almost $1.8 million in economic and noneconomic damages. We affirm in part, reverse in part, and vacate the future economic damages award of $522,000.

I. FACTS AND PROCEDURAL HISTORY

In 2002, plaintiff was seventy years old. He was admitted to defendant St. Mary's Medical Center of Saginaw, Inc., to have his bladder removed because he was experiencing a lot of bleeding. He did not suffer from any central nervous system disorders or arm or leg weakness at that time.

The surgery did not go smoothly. At one point, a blood vessel was damaged and because of potential damage to plaintiff's colon from reduced blood supply, a colonoscopy had to be performed during the middle of the operation. He was in surgery about six hours. As he came out of the anesthesia, the nurse caring for him reported some weakness in both his hands. That condition was unchanged by the time he was moved to intensive care. Later that evening, defendant Dr. Schmiege noticed that plaintiff's left arm and hand were normal but the right arm was "abducting" (involuntarily moving up, away from his torso). As nurses examined plaintiff through the night, they recorded that his condition was not improving, and by around midnight, he had lost sensation in both hands. By 3:47 a.m., he had lost feeling in both arms and could not bend or move his fingers.

In the morning, doctors arrived and discovered that plaintiff could not move his left arm at all and his right arm had "significant neurological deficits." Doctors viewed this as a medical emergency and performed an emergency decompressive cervical laminectomy. However, by that time plaintiff had lost most of the use of his hands and arms. Plaintiff now requires a significant level of care and is in considerable pain from this injury.

After a trial, the jury returned a verdict finding Dr. Schmiege was negligent and that her negligence was a proximate cause of plaintiff's injuries. The jury awarded past and future economic and noneconomic damages totaling $1,750,500.

## II. CAUSATION

Defendants argue that plaintiff failed to prove causation in that plaintiff failed to produce sufficient expert testimony proving that a delay caused him to suffer a worse injury than he would have suffered without the delay. We disagree.

### A. STANDARD OF REVIEW

Defendants raised this issue in their motion for judgment notwithstanding the verdict or a directed verdict. This Court reviews de novo a trial court's decision on such motions. *Smith v Jones*, 246 Mich App 270, 273; 632 NW2d 509 (2001). An appellate court "review[s] the evidence and all legitimate inferences in the light most favorable to the nonmoving party. Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000).

### B. ANALYSIS

First, this is not a "loss of opportunity" case. In *Stone v Williamson*, 482 Mich 144; 753 NW2d 106 (2008), Chief Justice TAYLOR explained in his opinion that this doctrine is available " 'where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries.' " *Id.* at 152, quoting *Vitale v Reddy*, 150 Mich App 492, 502; 389 NW2d 456 (1986). This case is even less of a "lost opportunity" case than *Stone*, because there, had the plaintiff not sought medical treatment at all, the aneurysm in his leg would have ruptured and likely would have killed him. Here, had plaintiff not sought medical treatment, he would have had bloody urine and functional arms. In *Velez v Tuma*, 283 Mich App 396; 770 NW2d 89 (2009), the plaintiff did not plead a "lost opportunity" claim but only a traditional medical malpractice claim. Despite being instructed on "loss of opportunity," the jury found in favor of the plaintiff. This Court fully analyzed the relevant caselaw, agreed with the plaintiff that hers was a traditional medical malpractice claim, and affirmed the jury's decision. This case is factually and legally very similar to *Velez*, and we also conclude that plaintiff pleaded a traditional medical malpractice claim.

Turning to defendants' claim regarding the sufficiency of the evidence, the record does not reveal any testimony by a neurosurgical expert stating that an earlier laminectomy would have had a specific, better result. However, the evidence described by plaintiff, and reasonable inferences from it, is taken in the light most favorable to him. Here, the testimony clearly revealed that time was a factor. The evidence cited by plaintiff shows that his symptoms grew worse through the night. When defendant Dr. Bapineedu Maganti arrived in the

morning, he was dismayed at plaintiff's condition and
did his best to find out why nothing had been done
earlier. Dr. Schmiege testified that she agreed with Dr.
Maganti's assessment that plaintiff's condition during
the night qualified as a medical emergency. When Dr.
Mark W. Jones found out what was happening, he
ordered an immediate MRI and performed the laminec-
tomy as soon as possible. That procedure did do a bit to
relieve plaintiff's condition. From this evidence, we can
infer that an earlier procedure would have helped.

Defendants argue that Dr. Schmiege's actions did not
cause plaintiff's injury and that, if anyone caused plain-
tiff's injury, it was one of the nurses. They note that at
7:00 p.m., when Dr. Schmiege last examined him, plaintiff
exhibited to her no warning signs of neurological impair-
ment. This indeed is what Dr. Schmiege noted, but this
Court examines *all* the evidence in a light most favorable
to plaintiff. The jury may have decided that this was the
point at which Dr. Schmiege acted negligently and that
she should have diagnosed plaintiff's bilateral problems at
7:00 p.m. Also, there is a dispute over what happened
when Nurse Diana R Kazmerski, concerned about plain-
tiff's unimproved condition, paged Dr. Schmiege around
midnight. Dr. Schmiege testified that she never got that
call, but Nurse Kazmerski testified that she made the call,
it was answered, and the person whom she thought was
Dr. Schmiege said she would be right in to see plaintiff.
The next nurse on duty, Nurse Sarah Passariello-
Hartman, testified that someone she thought was Dr.
Schmiege examined plaintiff at 2:00 a.m., but Dr.
Schmiege testified that she was at home at that time. The
jury, weighing the credibility of these two witnesses, could
have been persuaded that Dr. Schmiege was trying to
protect herself or simply did not remember accurately
what happened that night. This testimony is sufficient
evidence to allow the jury to infer that Dr. Schmiege was

negligent in her treatment of plaintiff and that her failure
caused a delay that cost plaintiff the use of his arms.

### III. JURY AWARD OF FUTURE ECONOMIC DAMAGES

Defendants argue that there was no evidence pre-
sented showing that plaintiff would suffer any future
economic damages. We agree.

#### A. STANDARD OF REVIEW

This issue was raised in defendants' motion for a new
trial. This Court reviews for abuse of discretion a trial
court's decision whether to grant a new trial. *Barnett v
Hidalgo*, 478 Mich 151, 158; 732 NW2d 472 (2007). "An
abuse of discretion occurs when the decision results in
an outcome falling outside the range of principled
outcomes." *Id.*

#### B. ANALYSIS

Defendants contend that plaintiff's counsel argued
for attendant care services as an element of future
*economic* damages. On the contrary, in context, coun-
sel's reference to attendant care was a "suggestion"—as
counsel himself put it—regarding how to calculate
plaintiff's "pain and suffering [and] intimacy," which of
course are *noneconomic* damages. Counsel argued the
following to the jury in the context of *noneconomic*
damages:

> [H]ow do you—calculate items of this type? I'm going to
> make a couple suggestions.

> \* \* \*

> . . . But if you try to put it into real life terms, for
> example, instead of requiring the assistance of his daugh-

ters, if [plaintiff] had an aid, a full-time aid, even at minimum wage and they were with him 16 hours a day, and, remember, he needs care 24 hours a day, you know, it doesn't take long to do a calculation. And if you paid them more than minimum wage, if they are skilled workers, because that's what he needs to or could benefit from in order to make his life that much easier than it currently is, those calculations quickly, in the course of a year, are in excess of 50 to $70,000.

*Would that be fair compensation for Mr. Shivers in order to cope for the balance of his life and coping the previous five years with the pain that he suffers?* [Emphasis supplied.]

Buttressing this conclusion is that counsel—after listing braces, rails, handicaps, and a hospital bed as examples of *economic* damages—returned to figures similar to the estimated cost of attendant care services in referencing noneconomic damages. Specifically, counsel stated:

His non-economic damages leads us back here to this difficult issue. Given the same circumstances, does $50,000 every year, does $100,000 every year, is that fair compensation for complete loss of the use of your hands to do the things that we all take for granted or is that too minimal? As I said, there is no book that I can look to to help you, and you are going to have to exercise your judgment.

Consequently, during closing argument plaintiff did not specifically request damages for attendant care services as an element of the jury's miscellaneous future economic damages award.

However, plaintiff did present evidence that his family members assist him with eating, getting dressed, using the bathroom, and basic hygiene. And from this evidence, it is reasonably certain that plaintiff would sustain future economic damages from his disability. *Hofmann v Auto Club Ins Ass'n*, 211 Mich App 55, 108; 535 NW2d 529 (1995). Notably, however, plaintiff presented no evidence from which the jury could calculate such damages. While

"mere uncertainty as to the amount will not preclude the right of recovery," *Bonelli v Volkswagen of America, Inc*, 166 Mich App 483, 511; 421 NW2d 213 (1988) (quotation marks and citations omitted), and damages need not be ascertained with mathematical precision, *a reasonable basis must exist for their computation, Berrios v Miles, Inc*, 226 Mich App 470, 478-479; 574 NW2d 677 (1997). See also *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 767; 685 NW2d 391 (2004) (a jury's estimation of future economic loss must have support in the record).

While a jury may use its good sense and sound judgment to infer that plaintiff would require professional attendant care given the facts of this case, *Meier v Holt*, 347 Mich 430, 447; 80 NW2d 207 (1956), the only mechanism for calculating damages for attendant care was counsel's closing argument, and as pointed out previously, such a reference was related to the calculation of *noneconomic* damages.[1] Additionally, there was *no* evidence submitted at all about what attendant care costs were, what the typical rate was for such services, what plaintiff's life expectancy was, what the minimum wage was[2], or any other possible source of evidence upon which the jury could render an award.

This case is similar to what was addressed by this Court in *Attard v Citizens Ins Co of America*, 237 Mich

---

[1] Even if the reference were to future economic damages, an attorney's argument cannot alone support the award because a jury's verdict regarding damages must be supported by the record. *Gilbert, supra* at 767.

[2] *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 280 Mich App 16; 761 NW2d 151 (2008), does not stand for the proposition that the current amount provided by the minimum wage law falls within the "common knowledge" of the jury, and other courts have been disinclined to so conclude. See, e.g., *Mendralla v Weaver Corp*, 703 A2d 480, 485 (Pa Super, 1997) (estimated cost of future medical expenses not within common knowledge of jury); *Potter v Homestead Preservation Ass'n*, 97 NC App 454, 463; 389 SE2d 146 (1990) (Greene, J., concurring in part and dissenting in part), rev'd on other grounds, 330 NC 569 (1992).

App 311, 321-322; 602 NW2d 633 (1999), where we held that the defendant's motion for judgment notwithstanding the verdict should have been granted on the basis of insufficient evidence concerning the *cost* of health care related items:

> [A] trial court should grant a party's motion for JNOV with respect to certain damages if the jury was permitted to speculate concerning the amount of those damages. [*Farm Credit Services of Michigan's Heartland, PCA v Weldon*, 232 Mich App 662, 680; 591 NW2d 438 (1998)]. See *Scott v Boyne City, G & A R Co*, 169 Mich 265, 272; 135 NW 110 (1912), in which our Supreme Court stated that "a case should not be submitted to the jury where a verdict must rest upon conjecture or guess."

> On the basis of the record in this case, we conclude that plaintiff presented insufficient evidence from which the jury could have found that he suffered $9,600 in damages related to the massage therapy or $2,100 in damages related to the health-club membership. Plaintiff's physician, Dr. Eric Backos, testified that he prescribed both massage therapy and a health-club membership for plaintiff. However, plaintiff presented no evidence concerning either the cost of either the therapy or the membership.

Thus, the simple fact that plaintiff presented evidence from which it may be inferred that plaintiff would require professional attendant care cannot, *ipso facto*, "show[] the extent of the damages as a matter of just and reasonable inference . . . ." *Meier, supra* at 447. Therefore, we reverse the trial court's order that denied defendant's motion for judgment notwithstanding the verdict, and vacate the future economic damages award of $522,000.

IV. APPLICATION OF DAMAGES CAP

Defendants argue that the trial court erred by (1) applying the higher damages cap, MCL 600.1483(1), (2) using the cap that was in effect when the judgment was

entered, rather than the cap in effect when the complaint was filed, and, (3) failing to apportion the capped damages to past and future damages for purposes of calculating prejudgment interest. We disagree.

### A. STANDARD OF REVIEW

This issue raises questions of statutory construction, reviewed de novo by this Court. *Young v Nandi*, 276 Mich App 67, 70; 740 NW2d 508 (2007). However, in deciding whether plaintiff's injuries qualify for the higher cap, "the trial court is the finder of fact with regard to these unique elements of damage." *Id.* at 77.

### B. ANALYSIS

### (1) WHICH CAP APPLIES?

The trial court concluded that the higher cap applied because plaintiff suffered a total, permanent functional loss of two limbs. To qualify for the higher cap, plaintiff must be "hemiplegic, paraplegic, or quadriplegic resulting in a total permanent functional loss of 1 or more limbs," caused by the injury to his spinal cord. MCL 600.1483(1)(a)(*ii*). Plaintiff correctly notes that "loss of 1 or more limbs" is inconsistent with the definitions of "hemiplegic, paraplegic, or quadriplegic," which all involve at least two limbs. But defendants are correct that the wording used indicates *two* conditions must be met: hemiplegia, paraplegia, or quadriplegia *and* a resulting loss of limb function. The same problem attends both of these interpretations: defendants' reading renders the second part of the clause unnecessary (the Legislature could have simply said, "hemiplegic, paraplegic, or quadriplegic" for the same effect defendants argue) and plaintiff's reading renders the first part of the clause

unnecessary (the Legislature could have simply said, "The plaintiff has total permanent functional loss of 1 or more limbs."). Both interpretations are on equal ground as far as sensible readings, and defendants' two-conditions reading is more consistent with the actual language of the statute than that of plaintiff. The Legislature might have wanted a person to qualify who was basically a paraplegic but retained some functionality in one leg, for example. Thus, plaintiff must show he was "hemiplegic, paraplegic, or quadriplegic" to qualify for the higher cap.

It is a fundamental rule of statutory construction that unless defined in the statute, a word or phrase used in a statute should be accorded its plain and ordinary meaning. MCL 8.3a; *Cain v Waste Mgt, Inc (After Remand)*, 472 Mich 236, 245; 697 NW2d 130 (2005). Technical terms are to be accorded their peculiar meanings. MCL 8.3a; *Brackett v Focus Hope, Inc*, 482 Mich 269, 276; 753 NW2d 207 (2008). There can be little debate that "hemiplegic," "paraplegic," and "quadriplegic" are technical, medical terms. Defendants provide several medical dictionary definitions in support of their assertion that paralysis of both arms does not satisfy any of these conditions. However, the medical definition of "paraplegia" includes "superior paraplegia": "paralysis of both arms." *Stedman's Medical Dictionary* (26th ed). Further research into the meaning of these technical, medical terms revealed that although lay people may have preconceptions of what they may mean (e.g., no use of legs in paraplegia and no use of arms or legs in quadriplegia), the medical community defines them on the basis of where along the spinal column the injury occurs, rather than in how or where

on the body the injury manifests itself.[3] Likewise, "paralysis" is defined as "[l]oss of power of voluntary

---

[3] See, e.g., the American Association of Neurological Surgeons' website, which provides the following definitions <http://www.neurosurgerytoday.org/what/patient_e/spinal.asp> (accessed May 12, 2009):

> Tetraplegia (a.k.a. quadriplegia) results from injuries to the spinal cord in the cervical (neck) region, with associated loss of muscle strength in all four extremities.

> Paraplegia results from injuries to the spinal cord in the thoracic or lumbar areas, resulting in paralysis of the legs and lower part of the body.

The website's glossary defines "hemiplegia" as "[p]aralysis of one side of the body." *Id.*

These conditions can be either "complete" or "incomplete":

> A complete SCI [Spinal Cord Injury] produces total loss of all motor and sensory function below the level of injury. Nearly 50 percent of all SCIs are complete. Both sides of the body are equally affected. Even with a complete SCI, the spinal cord is rarely cut or transected. More commonly, loss of function is caused by a contusion or bruise to the spinal cord or by compromise of blood flow to the injured part of the spinal cord.

> In an incomplete SCI, some function remains below the primary level of the injury. A person with an incomplete injury may be able to move one arm or leg more than the other, or may have more functioning on one side of the body than the other. An incomplete SCI often falls into one of several patterns. [*Id.*]

Notably, one of these "incomplete patterns" is "central cord syndrome," described thus:

> Central cord syndrome usually results from trauma and is associated with damage to the large nerve fibers that carry information directly from the cerebral cortex to the spinal cord. Symptoms may include paralysis and/or loss of fine control of movements in the arms and hands, with far less impairment of leg movements. Sensory loss below the site of the SCI and loss of bladder control may also occur, with the overall amount and type of functional loss related to the severity of damage to the nerves of the spinal cord. [*Id.*]

Plaintiff was diagnosed with central cord syndrome by Dr. Jones.

movement in a muscle through injury to or disease of its nerve supply." *Stedman's Medical Dictionary* (26th ed). This is not the same as "total loss of voluntary movement" that defendants would use to define the term. This more complex understanding of the terms used by the Legislature gives meaning to the second part of the clause because it explains how a person may have one of the listed conditions but still have lost the functional use of only one limb. The terms "hemiplegic, paraplegic, or quadriplegic" do not describe a plaintiff's *symptoms* (i.e., inability to use a limb) but the *injury*: a particular kind of damage to the nervous system. In addition to the injury, a plaintiff must exhibit a particular symptom: "total permanent functional loss of 1 or more limbs . . . ." Thus, defendants are correct in reading the statute as containing two requisite conditions, but plaintiff is correct in understanding that the medical conditions indicated by the Legislature are not as narrowly drawn as defendants would read them. The trial court did not err by finding the higher cap applies to plaintiff even though the limbs in question are his two arms.

The next question is whether the trial court clearly erred by finding as a matter of fact that plaintiff had suffered total, permanent, functional loss of both his arms even though he can use them when he uses his walker. As plaintiff notes, defendants presented no factual testimony regarding the extent to which plaintiff can use his arms. The facts identified by plaintiff are in the record: plaintiff testified that his arm braces helped him endure what would otherwise be constant pain and that he could use his left hand to feed himself, but only with a plastic spoon (metal is too heavy) and only certain foods. His right arm does not bend at the elbow.

Plaintiff argues that the Court must not overlook the presence of the word "functional" preceding "use." The trial court agreed that plaintiff's ability to use his arms to brace himself on his walker may be "using" his arms, but stated that it does not mean plaintiff has any "functional use" of those limbs. We agree. Defendants' reading replaces the word "functional" with "any," but this is impermissible revision of the statute as written. "Functional use" is similar to the concept of "loss of use," meaning " 'the destruction of the usefulness of the member, or the entire member, for the purposes to which, in its normal condition, it was susceptible of application.' " *Cain, supra* at 251 (quoting *Fuller v Locomotive Engineers' Mut Life & Accident Ins Ass'n*, 122 Mich 548, 553; 81 NW 326 [1899]). Plaintiff's testimony showed that although he could use his arms in certain ways to his benefit, they were no longer *functional* in the way that normal arms are. The trial court did not err by concluding that plaintiff's condition met the requirements necessary to gain the benefit of the higher cap.

### (2) WHICH YEAR'S CAP APPLIES?

In *Velez, supra*, this Court stated:

> The statutory cap is applied, if at all, at the time the judgment is entered, and not when the complaint is filed. Thus, the amount of the statutory cap in effect at the time the judgment is entered is the cap that applies to an award of noneconomic damages. Until that time, a plaintiff has no right to enforce a verdict awarding noneconomic damages. See *Wessels v Garden Way, Inc*, 263 Mich App 642, 653; 689 NW2d 526 (2004). [*Velez, supra* at 417].

The verdict does not exist until the end of trial, sometimes years after the complaint is filed. The court cannot review a verdict to determine if a cap applies

until the verdict has been rendered. The plain reading of this provision is that the court uses the limitation in effect at the time the court is conducting the review; if the Legislature intended the court to apply a cap from another time, it would need to say so. Under defendants' proposed resolution, it would be possible to have a verdict where the amount of noneconomic damages is below the cap in existence at the time the judgment is entered, but above the cap in existence at the time the suit is filed. Dollar figures are generally given to the jury in terms of present value, not their value at the time suit is filed. Moreover, because the cap is adjusted yearly to reflect the cumulative annual percentage change in the consumer price index, it is possible for the index to *decrease* the cap. The point of the indexing is to keep the cap in line with current economic conditions. The successful plaintiff has no award to enforce until judgment is entered.

### (3) APPORTIONING CAP AMONG PAST AND FUTURE DAMAGES

Defendants provide no legal support for their theory that the cap should be applied proportionately to past and future noneconomic damages. The trial court held that it was bound by the jury's finding of a specific amount of past damages and it was bound to use that amount to determine prejudgment interest. In *Velez, supra*, this Court addressed this issue and concluded:

> For the same reason that applying the noneconomic damages cap to reduce the jury's award . . . is not considered "ignoring" the jury's decision, applying the cap to only the award of past noneconomic damages is not considered "ignoring" the jury's decision; it is merely the application of the law. [*Id.* at 418.]

In *Dawe v Dr Reuvan Bar-Levav & Assoc, PC*, 279 Mich App 552, 598, 761 NW2d 318 (2008), Judge

SMOLENSKI discussed at length the purposes of these statutes and concluded that to give effect to the remedial nature of the prejudgment interest statute, the cap should apply to reduce future damages first. *Dawe*, *supra* at 601-602 (SMOLENSKI, P.J., dissenting).

Although the majority opinion did not address this issue and decided the case on a different basis, Judge SMOLENSKI's dissent provides compelling reasoning on the issue. In *Dawe*, the trial court apportioned the cap between past and future noneconomic damages just as defendants here request. Judge SMOLENSKI noted that the purpose of the prejudgment interest statute is to provide a deterrence, " 'encouraging settlement at an earlier time and discouraging a defendant from delaying litigation solely to make payment at a later time.' " *Id.* at 599, quoting *Old Orchard by the Bay Assoc v Hamilton Mut Ins Co*, 434 Mich 244, 253; 454 NW2d 73 (1990), overruled on other grounds by *Holloway Constr Co v Oakland Co Bd of Co Rd Comm'rs*, 450 Mich 608, 615-616 (1996). Concerning the trial court's decision to proportionately apply the cap, Judge SMOLENSKI concluded:

> Although this solution appears equitable on its face, it is clear from its application that it significantly undermines the remedial purposes of MCL 600.6013. Future damages include damages for harm that the plaintiff will suffer during his or her remaining life. Further, future damages are reduced to a present cash value and payable with the judgment. Hence, a plaintiff will invariably receive timely compensation for his or her future losses. In contrast, past damages reflect losses that the plaintiff has already incurred and for which he or she has not yet received any compensation. [*Dawe, supra* at 601 (citations omitted).]

The trial court did not err by declining to proportionately reduce plaintiff's past and future noneconomic damages.

### V. CALCULATION OF DAMAGES

Defendants argue that the trial court erred by subtracting the settlement amount from the total, composite award because that resulted in defendants paying prejudgment interest on past damages for which plaintiff had already received compensation. We disagree.

#### A. STANDARD OF REVIEW

This Court reviews de novo an award of interest pursuant to MCL 600.6013. *Olson v Olson*, 273 Mich App 347, 349; 729 NW2d 908 (2006).

#### B. ANALYSIS

The trial court's order clearly indicates that it was going to do as defendants asked in this respect, and the sequence of figures follows defendants' proposed order. Defendants have not argued that the court erred in its basic calculations, nor have they pointed out what figures they take issue with. They provide no reason to reverse the trial court's decision, and their reply brief makes no attempt to counter plaintiff's argument. Thus, we decline to reverse the trial court.

#### VI. COLLATERAL SOURCE PAYMENTS

Defendants argue that either the jury improperly included medical expenses in its award or it awarded far more in "miscellaneous" expenses than the evidence supports. We disagree.

#### A. STANDARD OF REVIEW

A trial court's interpretation and application of MCL 600.6303 is a legal issue, reviewed de novo. *Heinz v Chicago Rd Investment Co*, 216 Mich App 289, 295; 549 NW2d 47 (1996).

### B. ANALYSIS

MCL 600.6303(1) provides, in relevant part:

> In a personal injury action in which the plaintiff seeks to recover for the expense of medical care, rehabilitation services, loss of earnings, loss of earning capacity, or other economic loss, *evidence* to establish that the expense or loss was paid or is payable, in whole or in part, by a collateral source *shall be admissible* to the court in which the action was brought *after a verdict for the plaintiff and before a judgment is entered on the verdict.* [Emphasis added.]

Collateral source payments can only be used to reduce corresponding amounts awarded for the same type of damages. *Heinz, supra* at 305. In *Heinz,* the jury award was for medical expenses and lost wages combined. The trial court declined to reduce that by workers' compensation payments received because it had no way of knowing how much of the award was for medical expenses and how much was for wage loss. This Court reversed, noting that "both types of damages are 'paid or payable' by worker's compensation." *Id.* Thus, there was no problem subtracting the payments under the collateral source rule.

In this case, however, the only evidence regarding economic damages concerned the in-home care plaintiff's family provided him. The alleged collateral sources, including social security and disability insurance, did not cover these expenses. The trial court correctly noted that any attempt to parse the jury verdict into collateral-covered and noncollateral-covered expenses would be pure speculation. Defendants are stuck with their own verdict form. *Weiss v Hodge (After Remand),* 223 Mich App 620, 636; 567 NW2d 468 (1997).

Affirmed in part and reversed in part. We vacate the future economic damages award of $522,000. No costs, neither party having prevailed in full. MCR 7.219.

MURRAY, J., concurred.

SERVITTO, J. *(concurring in part and dissenting in part)*. I respectfully dissent with regard to the majority's conclusion that defendants' motion for judgment notwithstanding the verdict should have been granted and that the future economic damages award of $522,000 should be vacated. I agree with the majority opinion in all other respects.

I first disagree with the majority's conclusion that counsel's reference to attendant care services was a suggestion regarding how to calculate *noneconomic* damages. While counsel's closing argument could certainly have been more precise, the gist of his request of the jury can be gleaned from the argument in its entirety. Counsel stated:

> There are two considerations here . . . . One consideration is economic and the other consideration is called non-economic. I want to talk about non-economic first.
>
> You've heard testimony regarding what this gentleman has to endure both in terms of pain, but trying to understand his life in terms of calculating, what's a fair way to evaluate how he can be compensated?

Counsel then described what plaintiff was unable do without the assistance of others, and continued:

> What the law says he's entitled to recover is compensation for not only the physical pain and suffering but the consequences of these problems. Think about the indignity of having to be dressed by other people . . . .
>
> * * *
>
> How do you—how can you calculate items of this type? I'm going to make a couple suggestions. You are not bound by them. . . .
>
> [I]f we were talking about one of the Tiger pitchers or

the Tiger catcher and we said to you he suffered an accident, it was as a result of someone's negligence and now for the balance of his life he cannot use his hands and arms in the normal function that you and I use our hands and arms, you wouldn't hesitate to try and calculate his monetary loss based on his annual salary. . . .

Nobody is talking about compensating Mr. Shivers in that type of context. But if you try to put it into real life terms, for example, instead of requiring the assistance of his daughters, if he had an aid, a full-time aid, even at minimum wage and they were with him 16 hours a day, and, remember, he needs care 24 hours a day, you know, it doesn't take long to do a calculation. And if you paid them more than minimum wage, if they are skilled workers, because that's what he needs or could benefit from in order to make his life that much easier than it currently is, those calculations quickly, in the course of a year, are in excess of 50 to $70,000.

Would that be fair compensation for Mr. Shivers in order to cope for the balance of his life and coping the previous five years with the pain that he suffers?

Counsel then detailed the questions on the jury verdict form, continuing:

And finally there are questions about calculating his economic damages.

So think about things like expenses that he may incur for these braces and expenses that he may incur trying to make sure that his home has rails and handicaps [sic] and a hospital bed.

His non-economic damages leads us back here to this difficult issue. Given the same circumstances, does $50,000 every year, does $100,000 every year, is that fair compensation for complete loss of the use of your hands to do the things that we all take for granted or is that too minimal? . . .

The second page of the form deals with the future, and I mentioned to you that part of the damage equation is

whether or not he will sustain damages in the future. In the non-economic we know he's not getting well. . . . So his ability to do anything for himself is going to diminish with time, not get better.

And if his wife doesn't survive him, if he survives her, then he's still going to be dependent on his children. He's still going to need or want to access outside help in order to cope with these daily issues that his wife will no longer be able to provide. Or if she becomes ill and can't do it, you have to give consideration to the replacement, and we know he can't get well from this point forward.

Viewing counsel's argument in its entirety, there was no clear distinction between counsel's arguments regarding economic and noneconomic damages. While counsel undoubtedly referenced noneconomic damages, in the same train of thought he also referenced the computation of lost wages—an economic damage. Contrary to the majority's conclusion, there was no true delineation between economic and noneconomic damages in counsel's argument to suggest that counsel was referring solely to noneconomic damages when speaking about the daily care and assistance plaintiff required.

I also disagree with the majority's conclusion that there was no evidence upon which the jury could base its award for future economic damages. As acknowledged by the majority, the evidence unequivocally established that plaintiff required assistance in dressing, using the bathroom, and, among other things, with basic hygiene. As also acknowledged by the majority, the evidence made it clear that plaintiff was reasonably certain to sustain future economic damages as a result of his disability. In the closing argument, plaintiff's counsel suggested that a fair way to measure damages might be to consider a minimum wage payment to a caregiver for 16 hours a day. Plaintiff's counsel did not

ask the jury to speculate and award the rate paid to professional attendant care workers. The record supports the reasonable conclusion that counsel, perhaps without precision, requested attendant care services as an element of future economic damages at minimum wage for 16 hours a day. Jurors are free to consider their own general knowledge and intelligence concerning the affairs of life. *Rajnowski v Detroit, BC & A R Co*, 74 Mich 15, 17; 41 NW 849 (1889). Perhaps not all in the general public know with specificity the prevailing minimum wage, but one can safely conclude that the majority of the general public is aware that current minimum wage is less than ten dollars an hour. Moreover, there is no bright-line degree of specificity required in the calculation of damages. Courts allow the reasonable estimation of damages where actual damages are difficult or impossible to calculate. *Cicelski v Sears, Roebuck & Co*, 422 Mich 916, 918 (1985) (statement by LEVIN, J.). This is not a case where the jury's award of future economic damages exceeded the bounds of reason.

No one disputes that plaintiff requires, and will continue to require, assistance with the most basic tasks of daily living. There is also no dispute that one of the individuals who previously assisted plaintiff with his daily tasks is now deceased, and that plaintiff's elderly wife is finding it more and more difficult to assist him. Clearly, plaintiff will have to look to others for assistance in the future. The evidence at trial established the need for attendant care services as a part of future economic damages. Counsel's request for attendant care services as an element of future economic damages, at the rate of minimum wage, was sufficient to allow the jury to return its award of $522,000.

We also cannot forget that our circuit courts are courts of equity. Because the evidence clearly established plaintiff's future economic damages (the need for attendant care services), and plaintiff's counsel's closing argument can readily be interpreted as a request for minimum wage compensation for these damages, and the jury, after careful and considered deliberation determined that plaintiff was entitled to these damages, it would be inequitable to deny these damages simply because counsel bounced back and forth during his closing argument between his request for noneconomic and economic damages. I would affirm the trial court's denial of defendants' request for judgment notwithstanding the verdict with regard to the future economic damages.