# STATE OF MICHIGAN

# COURT OF APPEALS

LIBBEY BRYSON, as next friend of ASIA
ANDERSON, a minor,

        Plaintiff-Appellee,

v

GENESYS REGIONAL MEDICAL CENTER,

        Defendant-Appellant,
and

JENNIFER L. TRACY, R.N., STACEY A.
NELSON, R.N., CAROL POWERS, D.O.,
WOMEN'S SPECIALTY ASSOCIATES, and
HOLLY JASKIERNY, D.O.,

        Defendants.

UNPUBLISHED
April 3, 2018

No. 333135
Genesee Circuit Court
LC No. 10-092893-NH

Before: JANSEN, P.J., and CAVANAGH and GADOLA, JJ.

PER CURIAM.

In this medical malpractice action, defendant Genesys Regional Medical Center (Genesys) appeals as of right a judgment entered on the jury verdict in favor of plaintiff Asia Anderson in the amount of $2,997,623. Genesys contends that errors at trial entitle it to judgment notwithstanding the verdict (JNOV) or, in the alternative, a new trial. We affirm in part and reverse in part.

## FACTS

This case arose after plaintiff sustained a permanent injury to her brachial plexus, a network of nerves that originate near the neck and shoulder, during her birth at Genesys Regional Medical Center on January 1, 2008, at 3:05 a.m. A few days earlier, plaintiff's mother, Libbey Bryson, had been admitted to the hospital after contracting influenza late in her pregnancy. Bryson was also exhibiting signs of preeclampsia. Once she recovered sufficiently from the flu to tolerate labor, Bryson and her attending physician, Dr. Carol Powers, agreed to induce labor. Dr. Powers testified that Bryson's pregnancy was routine except for diagnoses of gestational diabetes and obesity. Pitocin, a drug designed to induce labor, was administered starting just

-1-

after noon on December 31, 2007. Dr. Andy Phung, a first-year resident performing an obstetrics rotation at Genesys, and Dr. Tammi Starr, a third-year resident practicing obstetrics and gynecology at Genesys, monitored Bryson's labor throughout the day and night, which included use of an electronic fetal heart rate monitor.

In the late evening during Bryson's labor, the electronic fetal heart rate monitor displayed various periods of diminished variability in the fetal heart rate pattern, decelerations likely caused by compression of the umbilical cord, and tachycardia, or an abnormally rapid heart rate, the concern of which is fetal hypoxia or acidosis. At 11:20 p.m., Bryson was given oxygen via a mask. At 1:20 a.m., an amnioinfusion was performed to increase the level of fluid in the uterus to attempt to relieve pressure on the umbilical cord. Pitocin was stopped at 1:37 a.m., but was resumed at 2:00 a.m. By 2:45 a.m., delivery was imminent as Bryson's cervix was dilated to 9¾ centimeters.

Dr. Powers testified that she was contacted at 11:00 p.m. regarding the progress of Bryson's labor, but then was not called again until approximately 2:45 a.m. Dr. Powers explained that she immediately began traveling to the hospital, but was delayed roughly five minutes due to snowy weather. Dr. Phung and Dr. Starr were both in the room with Bryson as the delivery proceeded. Plaintiff's father, Demarius Anderson, and Bryson's nephew, Joshua McEchian, were also present in the room. Dr. Phung made the first attempt to deliver the baby. Once plaintiff's head had been delivered, the baby's anterior shoulder became stuck against Bryson's pubic bone. Dr. Starr diagnosed a shoulder dystocia, asked Dr. Phung to step aside, had Bryson placed in the McRoberts position,[1] and had a nurse apply suprapubic pressure while she attempted to free the anterior shoulder. Her attempt was unsuccessful. Dr. Holly Jaskiernay, the staff obstetrician and gynecologist at Genesys that night, entered the room after plaintiff's head had been delivered and while Bryson was still in the McRoberts position. Dr. Jaskiernay was present while Dr. Starr unsuccessfully attempted to free plaintiff's anterior shoulder by performing the Woods corkscrew maneuver;[2] she then attempted to perform the maneuver herself. When both attempts were unsuccessful, Dr. Jaskiernay attempted to deliver plaintiff's posterior arm, which ultimately freed her anterior shoulder and delivered the rest of the body.

Following the delivery, plaintiff was diagnosed with a permanent brachial plexus injury affecting all levels of the nerve roots. When plaintiff was six months old, she underwent surgery at the University of Michigan, during which neurologists took three nerves from her leg and grafted them into her shoulder. Plaintiff underwent a second surgery when she was three years old, at which point her parents learned her brachial plexus would never regain normal function.

---

[1] The McRoberts position involves placing a mother's legs up against her chest during delivery to attempt to expand the opening of the pelvis.

[2] The Woods corkscrew maneuver is a rotational maneuver in which a physician attempts to rotate the shoulders of an infant 180 degrees to release an obstructed shoulder from the pelvis of the mother during delivery.

PROCEDURAL HISTORY

Plaintiff filed a medical malpractice action against Dr. Powers and her practice, Women's Specialty Associates, P.C., Dr. Jaskiernay, two nurses, Jennifer Tracy and Stacey Nelson, and Genesys, raising numerous theories of liability.[3]  The case proceeded to trial over 12 days in September 2013.  Regarding the specific mechanism of injury, plaintiff's theory at trial was that one of the Genesys residents, either Dr. Phung or Dr. Starr, caused plaintiff's brachial plexus injury by applying excessive lateral or rotational traction to plaintiff's head or neck after encountering the shoulder dystocia.  Genesys' theory was that plaintiff was injured by the endogenous forces of labor (Bryson's contractions), after her shoulder became stuck during delivery.

Plaintiff's standard of care expert, Dr. David Plourd, testified that plaintiff's permanent brachial plexus injury was the result of "excessive lateral and/or rotational traction on the nerves of the right side of the neck due to delivery by inexperienced obstetricians without supervision at the time of delivery."  Dr. Plourd testified that plaintiff suffered a "pan-plexopathy," which affected all levels of the nerve roots.  He explained that the "most common" and "number one cause" of a permanent brachial plexus injury is excessive lateral or rotational traction applied by the delivering physician, which accounts for 90 to 94% of cases of permanent brachial plexus injury.  According to Dr. Plourd, the propulsive forces of labor alone have never been scientifically shown to cause permanent brachial plexus injury.  He explained that congenital defects, osteomyelitis, and utero anomalies during pregnancy could also result in brachial plexus deficiencies, but none of these exceptions offered a "biologically plausible alternative explanation" for plaintiff's injury in this case.  Dr. Plourd explained that hospital records revealed plaintiff had bruising on her right cheek and forehead after birth, which he said confirmed that excessive traction was applied in a downward fashion.

Dr. Plourd explained that physicians with less than four years of experience following a residency are more likely to cause brachial plexus injuries during a delivery.  He testified that the standard of care required the Genesys residents to contact Dr. Powers when Bryson was eight centimeters dilated and when she had the urge to push.  In Dr. Plourd's opinion, if an experienced physician, like Dr. Powers, had been present at the delivery, "[v]irtually every time" the physician using appropriate maneuvers could safely release an impacted shoulder and successfully deliver a fetus without causing permanent injury.

Dr. Plourd also testified that between 10:30 p.m. and 11:20 p.m. on the evening of delivery, the standard of care required the Genesys residents to notify Dr. Powers and to discuss with Bryson the possibility of a C-section due to persistent minimal variability and recurrent decelerations in the fetal heart rate.  He agreed, however, that the concern of minimal variability and recurrent decelerations is fetal hypoxia or acidosis, and that no hypoxia or brain damage occurred in this case.  But Dr. Plourd also testified that a C-section was "indicated by the standard of care" based on the "failure to descend, diabetic, the heart rate tracing, [and] how long

---

[3] Dr. Jaskiernay, Tracy, and Nelson were dismissed from the lawsuit before trial.  Dr. Powers was dismissed by plaintiff on the third day of trial.

[labor] had been going on . . . ." According to Dr. Plourd, if Bryson had undergone a C-section, there was a 96% chance that plaintiff would not have sustained brachial plexus injury.[4]

Dr. Plourd testified, however, that there is "no predicting a shoulder dystocia." He explained that there are "risk factors" or "red flags," but that there is no clinically reliable scoring system or test to predict when the condition will occur. Dr. Plourd explained that gestational diabetes is one of the "largest risk factors" because the babies of diabetic mothers preferentially gain weight in their shoulders and abdomen. Accordingly, Dr. Plourd testified that an infant of a diabetic mother is "[a]bsolutely" more likely to encounter shoulder dystocia than the same size baby of a non-diabetic mother, but he again reiterated that "[s]houlder dystocia is not preventable or predictable."[5]

In support of its theory of the case, Genesys called two experts: Dr. Brent Davidson and Dr. Robert Gherman. In Dr. Davidson's opinion, plaintiff's injury was caused by her shoulder getting stuck during delivery and the endogenous forces of labor applying force to expel the baby. Dr. Davidson testified that Bryson's labor progress was normal, that fetal heart rate monitor strips could not predict shoulder dystocia, and that nothing in the fetal heart rate tracings in this case required a C-section. Although Dr. Davidson acknowledged that the application of excessive traction in the presence of a shoulder dystocia could cause a brachial plexus injury, he eliminated that explanation after reviewing the testimony of the family members and physicians who were present at delivery and the medical records. Dr. Davidson testified that shoulder dystocia is unpredictable and that all of the maneuvers performed by the Genesys physicians were appropriate.

Dr. Gherman also opined that the brachial plexus injury in this case occurred due to shoulder dystocia and the endogenous forces of labor. Dr. Gherman testified that shoulder dystocia is unpredictable and unpreventable. Reviewing the medical records and deposition testimony in the case, Dr. Gherman did not see evidence that the Genesys residents applied excessive downward traction during delivery. Dr. Gherman agreed that he testified 10 years earlier that "if you thought there was excessive traction, then that injury should span the spectrum of the brachial plexus," and that he previously wrote for a presentation that, to avoid injuring the brachial plexus, a physician should not use an angle of traction toward the floor. He agreed that Dr. Phung testified during his deposition that he angled plaintiff's head toward the ground during delivery. In Dr. Gherman's opinion, the progress of labor throughout the case was normal and a C-section was never required by the fetal heart rate tracings. And in any event, Dr.

---

[4] Dr. Plourd explained that brachial plexus injuries can still occur during a C-section if a baby is pulled from the mother's abdominal cavity in an inappropriate way.

[5] Plaintiff also presented the testimony of Dr. Phung, Bryson, Anderson, McEchian, Lawrence Forman, plaintiff's original life care planner, Darlene Carruthers, plaintiff's supplemental life care planner, Dr. Virginia Nelson, plaintiff's treating physician at the University of Michigan, Dr. Harry Chugani, a pediatric neurologist who performed an independent medical examination of plaintiff, and Michael Thomson, an economist.

Gherman explained that the risk of poor fetal heart rate tracings is hypoxia and acidosis causing brain damage, which did not occur in this case.[6]

At the close of trial, the jury returned a verdict in favor of plaintiff, finding that the Genesys residents were professionally negligent (1) "in one or more of the ways claimed by Plaintiff with respect to failing to timely call Dr. [Powers] and provide accurate information regarding the status of [Bryson] and [plaintiff]" and that this was a "proximate cause of [plaintiff]'s injury" and (2) "in one or more of the ways claimed by Plaintiff with respect to applying excessive lateral or downward traction on [plaintiff]'s head or neck" and that this was a "proximate cause of [plaintiff]'s injury." The jury awarded damages for past and future medical and caretaker expenses, past and future pain and suffering, and lost earning capacity.

Following trial, Genesys filed a motion for JNOV, arguing that plaintiff had failed to demonstrate a genuine issue of material fact as to any of plaintiff's three theories of liability. Specifically, Genesys contended that plaintiff's "excessive traction" theory lacked a factual basis in the record, and that plaintiff's theories that the Genesys residents' failed to timely contact Dr. Powers and failed to properly respond to the fetal heart monitoring strips had not been demonstrated to be a proximate cause of plaintiff's injury. Genesys further contended that Dr. Plourd was not qualified to testify regarding the standard of care applicable to the Genesys residents. Finally, Genesys argued that it was entitled to JNOV regarding the jury's award of future damages for occupational and physical therapy because the only expert qualified to testify regarding plaintiff's need for the therapies, Dr. Virginia Nelson, testified that the therapies were unnecessary.

Genesys also moved for a new trial, asserting that the trial court erroneously allowed the admission of plaintiff's three unsupported theories of liability. Genesys also asserted that the trial court erroneously had allowed certain admissions from Dr. Powers at trial, improperly allowed Bryson's nephew, McEchian, and one of plaintiff's life care experts, Darlene Carruthers, to testify, improperly allowed evidence of plaintiff's past medical expenses after the close of proofs, and erroneously instructed the jury regarding M Civ JI 15.03 and 30.04. Genesys also argued that a new trial was required because plaintiff improperly inserted "reptile theory" into the trial, improperly used learned treatises to bolster Dr. Plourd's testimony, and improperly referred to Dr. Harry Chugani, an expert previously retained by Genesys but who was called during plaintiff's case-in-chief, as a defense expert. The trial court rejected Genesys' arguments and denied both motions. Genesys now appeals to this Court.

DISCUSSION

I. JUDGMENT NOTWITHSTANDING THE VERDICT: CAUSATION

At trial, plaintiff presented evidence suggesting three alternative theories of liability, being that the two Genesys residents breached the standard of care by (1) failing to appreciate fetal heart rate monitor strips that indicated the need to perform a Cesarean section (C-section),

---

[6] Genesys also presented the testimony of Dr. Powers, Dr. Jaskiernay, and Dr. Starr at trial.

(2) failing to timely contact the attending physician to ensure that a sufficiently experienced physician was present at delivery, and (3) applying excessive lateral or rotational traction to plaintiff's head or neck after encountering a shoulder dystocia during the delivery. On appeal, Genesys contends that plaintiff failed to prove causation with respect to any of the three theories, and that it was therefore entitled to judgment notwithstanding the verdict (JNOV). We disagree.

## A. STANDARD OF REVIEW

We review de novo a trial court's decision regarding a motion for JNOV. *Attard v Citizens Ins Co of America*, 237 Mich App 311, 321; 602 NW2d 633 (1999). In doing so, we view the evidence and all legitimate inferences arising from that evidence in a light most favorable to the nonmoving party. *Forge v Smith*, 458 Mich 198, 204; 580 NW2d 876 (1998). A motion for JNOV should be granted if a party fails to establish a claim as a matter of law. *Graves v Warner Bros*, 253 Mich App 486, 491-492; 656 NW2d 195 (2003). Additionally, a trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion. *Edry v Adelman*, 486 Mich 634, 639; 786 NW2d 567 (2010). We also review a trial court's decision regarding the qualification of an expert witness for an abuse of discretion. *Clerc v Chippewa Co War Mem Hosp*, 267 Mich App 597, 601; 705 NW2d 703 (2005).

## B. "NON-REASSURING STRIPS" THEORY

Genesys contends that plaintiff failed to establish a prima facie case regarding the "non-reassuring strips" theory because any negligence by the Genesys residents in failing to earlier pursue a C-section due to the fetal heart rate monitor strips was not a proximate cause of plaintiff's injury. We agree.

To establish a prima facie case of medical malpractice, a plaintiff must prove the following four elements:

> (1) the appropriate standard of care governing the defendant's conduct at the time of the purported negligence, (2) that the defendant breached that standard of care, (3) that the plaintiff was injured, and (4) that the plaintiff's injuries were the proximate result of the defendant's breach of the applicable standard of care. [*Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004).]

"Proximate cause incorporates two separate elements: (1) cause in fact and (2) legal or proximate cause." *Lockridge v Oakwood Hosp*, 285 Mich App 678, 684; 777 NW2d 511 (2009). Legal or proximate cause involves examining the foreseeability of consequences to assess whether a defendant should be held responsible for them. *Id.* Stated another way, proximate cause is that which, in a natural and continuous sequence, unbroken by an independent or unforeseen cause, produces injury. *McMillian v Vliet*, 422 Mich 570, 576; 374 NW2d 679 (1985). "To establish legal cause, the plaintiff must show that it was foreseeable that the defendant's conduct 'may create a risk of harm to the victim, and [that] the result of that conduct and intervening causes were foreseeable.' " *Weymers v Khera*, 454 Mich 639, 648; 563 NW2d 647 (1997), quoting *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977). Generally, proximate cause is a question for the jury to decide unless reasonable minds could not differ regarding the outcome. *Lockridge*, 285 Mich at 684.

Plaintiff's "non-reassuring strips" theory is premised on the idea that if Bryson had been offered and undergone an earlier C-section, she would not have been required to vaginally deliver plaintiff, plaintiff would not have encountered a shoulder dystocia during delivery, and therefore plaintiff would not have sustained a brachial plexus injury. Dr. Plourd testified at trial that "virtually all" women opt for a C-section once a physician recommends that course of action, and Bryson testified that she would have agreed to a C-section if she had been informed about plaintiff's heart rate issues during labor. Dr. Plourd also testified that, if a C-section had been performed, there was a 96% chance that plaintiff would not have sustained a brachial plexus injury. Dr. Plourd admitted, however, that the issues identified by the fetal heart rate monitor strips were minimal variability, recurrent decelerations, and tachycardia, the concern of which is not shoulder dystocia, but rather hypoxia or acidosis, which did not occur in this case. Because shoulder dystocia and plaintiff's resultant brachial plexus injury were not foreseeable harms of failing to pursue an earlier C-section on the basis of the non-reassuring strips, plaintiff failed to establish a prima facie case of medical malpractice with regard to this theory of liability. *Craig*, 471 Mich at 87, citing *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994) (citation omitted) (Proximate cause normally involves examining the foreseeablity of consequences and whether a defendant should be held legally responsible for such consequences).

## C. "FAILURE TO CONTACT" THEORY

Genesys next contends that plaintiff failed to establish a prima facie case regarding plaintiff's theory that Dr. Phung and Dr. Starr should have contacted Dr. Powers earlier to ensure that an experienced physician was present at the delivery. We agree that any negligence in this regard was not a proximate cause of plaintiff's injury. Dr. Plourd testified that it is impossible to predict shoulder dystocia, even in the presence of "risk factors:"

> *Q.* Did Ms. Bryson have any risk factors for delivering a child who might develop a shoulder dystocia?
>
> *A.* She did have some risk factors, and if I may, I just want to be very clear and qualify this. There is no—and this is a very like sad fact of life. There is no predicting a shoulder dystocia. That is to say there can be risk factors. There can be red flags, but we try clinically time and time and study after study and say, well, let's give two points for this risk factor, three points for this risk factor, and if they get a score of eight or more, we're going to say she's at high risk for a shoulder dystocia. That identifies maybe a third to a half of shoulder dystocias. So, there is no clinically applicable scoring system that's—in other words that's saying there no—nothing that really works clinically. You have your antennas up by having seen some red flags, and Ms. Bryson had several.
>
> *Q.* All right. . . . You can't predict with any degree of reliability when it's going to occur. Fair?
>
> *A.* That is correct.

A proximate cause is one that is a "foreseeable, natural, and probable cause." *Jones v Detroit Med Ctr*, 490 Mich 960, 960; 806 NW2d 304 (2011). Again, because Dr. Plourd testified that it is impossible to predict shoulder dystocia, even in the presence of risk factors like those experienced by Bryson, the Genesys residents could not have reasonably foreseen that their failure to earlier contact Dr. Powers and secure her presence at delivery would present the risk of harm to plaintiff of shoulder dystocia and brachial plexus injury. Accordingly, the residents' purported negligence in this regard was not a proximate cause of plaintiff's injury.

## D. "EXCESSIVE TRACTION" THEORY

Genesys also contends that plaintiff failed to establish a prima facie case regarding plaintiff's "excessive traction" theory, arguing that Dr. Plourd's opinion that either Dr. Phung or Dr. Starr applied excessive traction to plaintiff's head or neck during delivery to cause her brachial plexus injury was not supported by facts in the record and was based on the mere statistical probability that "most" brachial plexus injuries are caused by excessive traction. Genesys argues that Dr. Plourd's testimony was therefore inadmissible and unreliable for purposes of MRE 702 and MCL 600.2955. We disagree.

The admissibility of expert witness testimony is governed by MRE 702, which states:

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 702 incorporates the standards of reliability that the United States Supreme Court described in *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). See *Edry*, 486 Mich at 639. Under *Daubert*, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 US at 589. The existence, or lack thereof, of supporting literature, while not dispositive, is an important factor to determine the admissibility of expert testimony; it is generally insufficient to simply point to an expert's experience to argue that an opinion is reliable. *Elher v Misra*, 499 Mich 11, 23; 878 NW2d 790 (2016).

MCL 600.2955(1) requires a court to determine whether an expert's opinion is reliable and will assist the trier of fact by examining the opinion and its basis using the following factors:

> (a) Whether the opinion and its basis have been subjected to scientific testing and replication.

> (b) Whether the opinion and its basis have been subjected to peer review publication.

(c) The existence and maintenance of generally accepted standards governing the application and interpretation of a methodology or technique and whether the opinion and its basis are consistent with those standards.

(d) The known or potential error rate of the opinion and its basis.

(e) The degree to which the opinion and its basis are generally accepted within the relevant expert community. As used in this subdivision, "relevant expert community" means individuals who are knowledgeable in the field of study and are gainfully employed applying that knowledge on the free market.

(f) Whether the basis for the opinion is reliable and whether experts in that field would rely on the same basis to reach the type of opinion being proffered.

(g) Whether the opinion or methodology is relied upon by experts outside of the context of litigation.

At trial, Dr. Plourd testified that the "most common" and "number one cause" of permanent brachial plexus injury is excessive lateral or rotational traction applied by a physician during delivery, which accounts for 90 to 94% of permanent brachial plexus injury cases. On appeal, Genesys does not appear to challenge the reliability of this testimony per se,[7] but rather argues that the record does not include facts that would support that excessive traction occurred in this case. Having reviewed the record, we disagree with Genesys that Dr. Plourd's opinion that plaintiff's injury was the result of excessive traction applied during delivery was not supported by facts in the record and was based on nothing more than a statistical probability.

At trial, Dr. Plourd opined that "not just based on data, but based on the specifics of this case," plaintiff's injury was likely caused by "excessive traction having been applied by some inexperienced clinician." Dr. Plourd explained that the hospital records revealed that plaintiff had bruising on her right cheek and forehead, which he said confirmed that excessive traction was applied in a downward fashion on the infant's head. Bryson's nephew, McEchian, testified

---

[7] To the extent Genesys may be challenging Dr. Plourd's opinion that most cases of permanent brachial plexus injury result from excessive traction applied during delivery, we conclude that any such challenge is unpersuasive. Before trial, Genesys filed a motion in limine seeking to exclude Dr. Plourd's testimony, and, in response, plaintiff filed peer-reviewed articles and a medical textbook indicating that the most common cause of permanent brachial plexus injury is the application of excessive traction during delivery. In its opinion on the matter, the trial court noted that there are inherent difficulties regarding scientific testing and the potential rate of error regarding this kind of research, which requires the use of retroactive studies because researchers would not intentionally injure an infant during delivery. The trial court also found that "[t]here are at least two experts who agree that it was excessive traction that caused the injury to the Plaintiff in this case and the articles support that others in the medical field agree that brachial plexus injuries are caused by excessive traction and not maternal forces." We agree with the trial court that Dr. Plourd's testimony was not unreliable in this regard.

that Dr. Starr and Dr. Jaskiernay were pulling "really hard" on plaintiff's head to such an extent that he "thought they were going to rip her head off," and that Dr. Starr left a footprint on Bryson's bed as a result of her pulling. Dr. Plourd testified that the amount of force described by McEchian "sounded like excessive traction in anybody's book." Also, although Dr. Plourd admitted that permanent brachial plexus conditions could arise from congenital defects, infections, or other anomalies during pregnancy, he explained that none of these factors were present in this case.

Genesys' expert, Dr. Gherman, agreed that he earlier testified that "if you thought there was excessive traction, then that injury should span the spectrum of the brachial plexus." Dr. Plourd testified that plaintiff's injury constituted a "pan-plexopathy" affecting all levels of the nerve root. Dr. Gherman also agreed that he earlier wrote that, to avoid causing a brachial plexus injury, a physician should not angle the head of an infant toward the floor. Anderson testified that Dr. Phung and Dr. Starr both pulled on plaintiff's head after her body became stuck and that Dr. Phung was pulling "down." Dr. Phung himself also testified that he applied traction to the infant's head with a "slight angle toward the ground," although he disagreed that the traction he applied was excessive. Dr. Plourd testified it is never acceptable to angle an infant's head toward the floor when encountering a shoulder dystocia or to "pull hard." Considering this testimony in a light most favorable to plaintiff, Dr. Plourd's opinion that plaintiff's permanent brachial plexus injury resulted from the application of excessive traction during delivery was not based on a mere statistical probability, but was supported by specific facts in the record. Genesys has not shown that the trial court abused its discretion by allowing the testimony, or that it was entitled to JNOV regarding plaintiff's "excessive traction" theory.

Having concluded that at least one of plaintiff's theories was supported by evidence and therefore was appropriately submitted to the jury, we reject defendant's contention that it was entitled to JNOV.

## II. JUDGMENT NOTWITHSTANDING THE VERDICT: QUALIFICATION OF DR. PLOURD

Genesys also contends that it was entitled to JNOV because Dr. Plourd was not qualified to testify regarding the standard of care, and plaintiff therefore failed to present any competent proof regarding the applicable standard of care. We disagree.

In a medical malpractice action, a plaintiff must set forth expert testimony to establish the applicable standard of care and to demonstrate that a defendant breached that standard. *Birmingham v Vance*, 204 Mich App 418, 421; 516 NW2d 95 (1994). The admissibility of expert testimony is generally governed by MRE 702. In a medical malpractice action, a court's assessment of an expert's qualifications is further guided by MCL 600.2169. *Craig*, 471 Mich at 78. MCL 600.2169(1) states the following:

In an action alleging medical malpractice, a person shall not give expert testimony on the appropriate standard of practice or care unless the person is licensed as a health professional in this state or another state and meets the following criteria:

(a)  If the party against whom or on whose behalf the testimony is offered is a specialist, specializes at the time of the occurrence that is the basis for the action in the same specialty as the party against whom or on whose behalf the testimony is offered . . . .

(b)  Subject to subdivision (c), during the year immediately preceding the date of the occurrence that is the basis for the claim or action, devoted a majority of his or her professional time to either or both of the following:

> (*i*)  The active clinical practice of the same health profession in which the party against whom or on whose behalf the testimony is offered is licensed and, if that party is a specialist, the active clinical practice of that specialty.

> (*ii*)  The instruction of students in an accredited health professional school or accredited residency or clinical research program in the same health profession in which the party against whom or on whose behalf the testimony if offered is licensed and, if that party is a specialist, in an accredited health professional school or accredited residency or clinical research program in the same specialty.

In *Gonzalez v St John Hosp & Med Ctr*, 275 Mich App 290, 298-300; 739 NW2d 392 (2007), this Court held that a resident is a "specialist" for purposes of MCL 600.2169(1) in the area in which he or she is practicing at the time of the alleged malpractice.  Dr. Phung and Dr. Starr were both residents practicing obstetrics and gynecology at the time of the alleged malpractice in this case, so obstetrics and gynecology was the relevant specialty applicable to an expert proposing to offer standard of care testimony regarding their conduct.  At trial, Dr. Plourd testified that he was a board certified obstetrician and gynecologist who was actively working as a staff physician in obstetrics and gynecology at a hospital in California, a position which he had held since 2006.  He was therefore qualified to offer expert testimony for purposes of MCL 600.2169(1)(a) and (b).

However, "in addition to satisfying the requirements of MCL 600.2169(1)(a) and (b), a plaintiff must [also] affirmatively establish that his or her proffered expert is 'qualified as an expert by knowledge, skill, experience, training, or education' pursuant to MRE 702." *Gonzalez*, 275 Mich App at 304.  As part of this inquiry under MCL 600.2169(2), trial courts must evaluate, at a minimum, the following:

> (a) The educational and professional training of the expert witness.

> (b) The area of specialization of the expert witness.

> (c) The length of time the expert witness has been engaged in the active clinical practice or instruction of the health profession or the specialty.

> (d) The relevancy of the expert witness's testimony.

(3) This section does not limit the power of the trial court to disqualify an expert witness on grounds other than the qualifications set forth in this section.

When an expert matching the specialty of a resident practicing in the same specialty consistent with MCL 600.2169(1) offers testimony, the plaintiff must show that the expert has "sufficient knowledge, skill, experience, training, or education in, and familiarity with, the practice of the discrete specialty *by residents*." *Gonzalez*, 275 Mich App at 307 (emphasis added).

Genesys argues that Dr. Plourd was not qualified to testify regarding the standard of care applicable to Dr. Starr and Dr. Phung, who were both residents, because he did not work with residents in 2007 or 2008 when the incident giving rise to this case occurred or in 2013 when he testified at trial. At trial, Dr. Plourd testified that he received his medical degree from the University of California Los Angeles in 1982 and thereafter became board certified in obstetrics and gynecology. He testified that he was a clinical instructor in obstetrics and gynecology at the Santa Clara Valley Medical Center from 1987 until 2006, which regularly required him to work with residents "full time." Dr. Plourd explained that he was familiar with the standard of care applicable to residents by virtue of his 20 years of training and experience. Genesys has not shown that Dr. Plourd lacked sufficient knowledge, skill, experience, training, or education to offer an opinion regarding the standard of care merely because he did not oversee residents in the year or two immediately preceding the alleged malpractice. Moreover, Dr. Plourd testified that the standard of care did not change between 2006 and 2008, and Genesys offered no expert testimony to contradict this assertion. Considering Dr. Plourd's educational background and professional experience working with residents in obstetrics and gynecology over two decades, the trial court did not abuse its discretion by concluding that he was qualified to offer expert testimony regarding the standard of care applicable to Dr. Starr and Dr. Phung as residents practicing obstetrics and gynecology.[8] Again, we conclude that Genesys was not entitled to JNOV.

## III. JUDGMENT NOTWITHSTANDING THE VERDICT: FUTURE ECONOMIC DAMAGES

Finally, Genesys contends that it was entitled to partial JNOV as to future economic damages for occupational and physical therapy because plaintiff presented insufficient evidence

---

[8] Citing *Cox v Bd of Hosp Managers for City of Flint*, 467 Mich 1; 651 NW2d 356 (2002), Genesys also argues that Dr. Plourd failed to set forth the standard of care specifically applicable to Dr. Starr and Dr. Phung, and instead improperly relied on a "team" or "unit" theory of liability. In *Cox*, our Supreme Court explained that a plaintiff in a medical malpractice action must establish the standard of care applicable to each agent alleged to have been negligent and may not assert a claim of negligence against an organizational unit within a hospital that includes numerous medical professionals to whom various standards of care apply. *Id.* at 12-14. The Court explained that a jury must be able to find "professional negligence or malpractice only on the basis of the particular standard of care applicable to each employee's profession or specialty." *Id.* at 14. At trial, Dr. Plourd outlined the standard of care applicable to residents practicing obstetrics and gynecology, which applied to Dr. Phung and Dr. Starr because they were both residents practicing obstetrics and gynecology at the time of the alleged malpractice. *Cox* is therefore inapplicable to the case at hand and does not dictate a contrary result.

of the need for this care. Specifically, Genesys argues that Dr. Nelson, plaintiff's treating physiatrist, was the only witness qualified to offer testimony regarding plaintiff's need for occupational and physical therapy, and she testified that it was not necessary for plaintiff to receive such therapy an hour each week until she turned 18, but that Darlene Carruthers, plaintiff's supplemental life care planner, and Lawrence Forman, plaintiff's original life care planner, nonetheless included the therapy in plaintiff's life care plans. We disagree that plaintiff presented insufficient evidence.

A plaintiff asserting a medical malpractice claim bears the burden of establishing damages with reasonable certainty. *Shivers v Schmiege*, 285 Mich App 636, 643; 776 NW2d 669 (2009). Although damages need not be ascertained with mathematical certainty, a reasonable basis must exist from the record to support their computation. *Id.* at 644; see also *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 767; 685 NW2d 391 (2004) (stating that a jury's estimation of future economic loss must have support in the record).

We agree that Dr. Nelson's opinions regarding plaintiff's need or lack thereof for occupational and physical therapy are somewhat inconsistent. During her deposition, Dr. Nelson testified as follows regarding plaintiff's need for occupational therapy:

> *Q.* [D]id you tell or advise Lawrence Forman, that Asia Anderson would need occupational therapy once a week during her childhood years, from this point on, until the time she's 18?
>
> *A.* I did not say that.
>
>      \*   \*   \*
>
> *Q.* Do you have an opinion as to whether or not she's going to need occupational therapy once a week her entire childhood years?
>
>      \*   \*   \*
>
> *A.* Yes, I have an opinion, and the answer is no.
>
> *Q.* Okay. Under what circumstances will she need occupational therapy?
>
> *A.* When she and her family and physicians seeing her identify goals that need to be—that are problem areas for her, that need to be worked on.
>
> *Q.* So is that something that is done on an occasional time?
>
> *A.* It's done either through a routine visit, where it's identified, or if the family identifies an issue and calls and says, "We have a new issue," and then it becomes a visit for that issue.
>
> *Q.* Sure. So it would be fair to say this is an occasional thing, rather than a constant?

* * *

　　*A*. That is correct.

When asked whether she recommended or told Forman that plaintiff would need physical therapy, Dr. Nelson responded, "No." However, Dr. Nelson also testified:

　　*Q*. You would agree, wouldn't you, that if this child doesn't receive adequate physical [and] occupational therapy, that she can deteriorate and regress?

　　*A*. I think in the grand scheme of things with these kids, therapy a few hours a week makes some difference, but what really makes a difference is what they do every day with their arm and their lives. And that impacts on what the family does with them, and as they become older, what they themselves do to maintain or increase their range of motion, their strength and their function.

Finally, Dr. Nelson testified that she reviewed Forman's report, and when asked, "You agreed with the contents of the report, unless you suggested otherwise?" she responded, "Other than where I made comments." Carruthers then explained at trial that in the Forman report she received back from Dr. Nelson, Dr. Nelson "did not take out, or cross out, or even indicate if needed" next to the items for physical and occupational therapy. Carruthers explained that she updated the report "based upon [Dr. Nelson's] review of the report" and that Dr. Nelson "did not take those items out."

On one hand, then, Dr. Nelson testified that she did not believe weekly occupational therapy was needed and that she did not recommend weekly physical therapy to Forman. On the other hand, Dr. Nelson testified that a few hours of occupational and physical therapy each week "makes some difference" for children with injuries like plaintiff, and that if she did not take an item out of Forman's report, she agreed with the item. Carruthers then explained that Dr. Nelson left the items of weekly occupational and physical therapy in the report she reviewed from Forman. While we note these apparent inconsistencies, we disagree that there was no evidence in the record establishing a need for weekly occupational and physical therapy.

Additionally, Carruthers testified that weekly occupational and physical therapy were necessary for plaintiff's future medical care. Genesys argues that Carruthers was not qualified to offer such testimony because she is not a physician. However, pursuant to MRE 702, a person is qualified to testify as an expert witness by virtue of his or her knowledge, skill, experience, training, on the subject matter of the testimony. See *Grow v WA Thomas Co*, 236 Mich App 696, 713; 601 NW2d 426 (1999). Carruthers testified that she had worked for over 40 years with individuals who have physical limitations and disabilities, that she had a bachelor's degree in "physical impairment, cognitive impairment learning, and emotional difficulties" and a master's degree in "vocational rehabilitation and habilitation." She also testified that she is a certified rehabilitation counselor and a certified disability management specialist. Although she agreed that she would defer to Dr. Nelson regarding plaintiff's medical needs, in her opinion, physical and occupational therapy were therapeutic, not medical, needs. Considering Carruthers' background and experience, the mere fact that she is not a medical practitioner should not render

her incapable of offering testimony as an expert witness. See *Grow*, 236 Mich App at 713 (explaining that social worker with 14 years of clinical experience counseling victims of sexual, physical, and emotional abuse could render expert testimony regarding the symptoms of PTSD). Instead, any limitations on Carruthers' testimony would be relevant to the weight of the testimony, not its admissibility. *Id.* at 714.

We also note that Dr. Chugani, a pediatric neurologist, testified that there would be atrophy in plaintiff's right arm for the rest of her life as the result of her injury, and that preventing that atrophy would be dependent upon "how diligently she is subjected to physical and occupational therapy . . . ." Considering the record as a whole in a light most favorable to plaintiff, we conclude that Genesys was not entitled to partial JNOV regarding plaintiff's damages claim related to occupational and physical therapy.

## IV. MOTION FOR A NEW TRIAL

Having concluded that Genesys was not entitled to JNOV, we turn to Genesys' contention that it is entitled to a new trial in light of a number of alleged errors at trial.

## A. STANDARD OF REVIEW

Generally, we review for an abuse of discretion a trial court's denial of a motion for a new trial. *Abke v Vandenberg*, 239 Mich App 359, 361; 608 NW2d 73 (2000). A trial court abuses its discretion when its decision is outside the range of reasonable and principled outcomes. *Kalaj v Khan*, 295 Mich App 420, 425; 820 NW2d 223 (2012).

## B. ERRONEOUS INJECTION OF INADMISSIBLE THEORIES

Genesys contends that if any of plaintiff's three theories of liability fail as a matter of law, it is entitled to a new trial because any evidence regarding non-causal negligence of the Genesys residents was inadmissible and unfairly prejudicial to Genesys under MRE 404(b). We disagree.

We first note that this issue is unpreserved. In its motion for new trial before the trial court, Genesys argued that if the trial court found that any one of plaintiff's theories of liability had been submitted erroneously to the jury, a new trial was warranted because the jury verdict might have been based on one of the impermissible theories. The trial court denied the motion. On appeal, Genesys now argues that it is entitled to a new trial because admission of the impermissible theories substantially prejudiced Genesys as the admission of "other bad acts" evidence prohibited under MRE 404(b), an argument Genesys did not raise before the trial court. To preserve an evidentiary error for appeal, a party must object at trial on the same ground that it presents on appeal. *Klapp v United Ins Group Agency*, 259 Mich App 467, 475; 674 NW2d 736 (2004). Having failed to raise this ground before the trial court, Genesys is not entitled to have it reviewed on appeal.

In a criminal case or a case involving the termination of parental rights, this Court reviews unpreserved claims for plain error affecting substantial rights because those cases involve fundamental liberties. See *Napier v Jacobs*, 429 Mich 222, 233; 414 NW2d 862 (1987). In a civil case, this Court has the discretion to review unpreserved claims of error, but is under no

obligation to do so. *Walters v Nadell*, 481 Mich 377, 387; 751 NW2d 431 (2008). This Court may review an unpreserved claim of error when the failure to do so would result in manifest injustice, when consideration is necessary to the proper determination of the case, or when the issue is a question of law and the facts necessary for resolution of the issue have been fully presented. *Smith v Foerster-Bolser Constr, Inc*, 269 Mich App 424, 427; 711 NW2d 421 (2006). But even when one of these criteria is present, our Supreme Court has cautioned that appellate courts should exercise their discretion sparingly and only when exceptional circumstances dictate that review is warranted. *Napier*, 429 Mich at 233. Our review of the record leads us to conclude that review of this unpreserved issue is necessary to the proper determination of this case so we will exercise our discretion to do so.

We conclude that the trial court did not abuse its discretion in denying Genesys a new trial. Under MRE 401, relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Relevant evidence is generally admissible unless it is otherwise prohibited by the United States or Michigan constitutions, the court rules, or the rules of evidence. MRE 402. "The relevance contemplated in MRE 401 and MRE 402 is logical relevance." *Rock v Crocker*, 499 Mich 247, 256; 884 NW2d 227 (2016). Even when evidence is logically relevant, it may be excluded under MRE 404 because MRE 404 "is a rule of legal relevance, defined as a rule limiting the use of evidence that is logically relevant." *Id.* (quotation marks and citation omitted). MRE 404(b)(1) states the following:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.

"Other-acts evidence is only admissible under MRE 404(b)(1) when a party shows that it is (1) offered for a proper purpose, i.e., to prove something other than the defendant's propensity to act in a certain way, (2) logically relevant, and (3) not unfairly prejudicial under MRE 403." *Rock*, 499 Mich at 257. In this case, although plaintiff's theories of "non-reassuring strips" and "failure to contact" may not have been sufficiently supported to justify submission to the jury, evidence related to those theories was not evidence of "other bad acts" so as to be precluded as character evidence under MRE 404(b).

In *Berwald v Kasal*, 102 Mich App 269, 273; 301 NW2d 499 (1981), this Court emphasized that it "is well-established that evidence introduced to show that a defendant may have breached certain duties of care unrelated to the duty at issue is generally inadmissible at trial." The *Berwald* Court held that a physician in a medical malpractice action was entitled to a new trial in large part because evidence was admitted at trial concerning his "breach of other duties" that "tended to show that he was a negligent doctor . . . ." *Id.* at 273. The Court noted that such evidence was inadmissible and highly prejudicial to the physician. *Id.* at 273-274. See also *Soto v Lapeer Co*, 169 Mich App 518, 521; 426 NW2d 409 (1988) (affirming a trial court's exclusion of evidence regarding a physician's forceps delivery of a baby who died shortly before

the alleged malpractice in the case occurred).  However, decisions of this Court issued before November 1, 1990, though potentially persuasive, are not binding precedent.  MCR 7.215(J)(1); *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2013).

In this case, evidence regarding the history of plaintiff's interaction with the Genesys residents is not the type of evidence excluded by MRE 404(b).  Although MRE 404(b)(1) prohibits the use of evidence to prove a person's character in order to show that the person acted in conformity therewith on a particular occasion, it does not preclude using that evidence for other relevant purposes.  *People v Sabin (After Remand)*, 463 Mich 43, 56; 614 NW2d 888 (2000).  Rather, MRE 404(b)(1) "is a rule of inclusion" that "permits the admission of evidence on any ground that does not risk impermissible inferences of character to conduct." *People v Starr*, 457 Mich 490, 496; 577 NW2d 673 (1998).

A review of the record in this case demonstrates that none of the evidence argued to be inadmissible risked the impermissible inference of character to conduct, and therefore was not prohibited under MRE 404(b).  Evidence of the events leading to the Genesys residents' negligent delivery, as found by the jury, is not suggestive of any type of general personality trait or propensity to act in any certain way.  Neither was it admitted in this case to prove that Genesys residents acted in conformity with any particular character trait.  Rather, the evidence was relevant to the overall question of Genesys' negligence, and was offered to establish a general course of conduct leading to the negligent delivery.  Evidence that Dr. Starr and Dr. Phung failed to recognize the high-risk nature of Bryson's pregnancy, appreciate that a C-section might be necessary, and ensure that an experienced physician was present during plaintiff's birth is all germane to their lack of knowledge and experience.  This is especially true given the testimony of plaintiff's standard of care expert, Dr. Plourd, who opined that the injury plaintiff suffered was likely a direct result of the residents' inexperienced handling of plaintiff's delivery. The evidence Genesys now claims was inadmissible was directly pertinent to plaintiff's theory of the case, which was that Genesys had breached its duty to provide a properly trained physician and negligently caused plaintiff's injury by creating an environment where two inexperienced and unsupervised residents attended a high-risk birth.  It was therefore highly relevant and not inadmissible under MRE 404(b).

Even assuming for the sake of argument that evidence of the residents' additional negligent acts was erroneously admitted in this case, the extreme remedy of a new trial is unwarranted because the admission of such evidence did not affect the outcome of the proceedings.  To support the jury verdict, plaintiff needed to succeed on one of the three theories of liability advanced at trial—the "non-reassuring strips" theory, the "failure to contact an experienced physician at delivery" theory, or the "excessive traction" theory.  For reasons unknown, the parties agreed to request a combined verdict on the first two of plaintiff's theories, asking the jury to make two specific findings: (1) whether Genesys was "professionally negligent in one or more ways claimed by Plaintiff with respect to failing to timely call Dr. Carol Powers and provide accurate information regarding the status of Libbey Bryson and Asia Anderson," and (2) whether Genesys was "professionally negligent in one or more of the ways claimed by plaintiff with respect to applying excessive lateral or downward traction on Asia Anderson's head or neck."  The jury answered both questions in the affirmative.

Genesys is mistaken in its assertion that a new trial is always warranted when one of several alternative theories of liability is found to have been improperly submitted to the jury. To the contrary, we have made clear that a new trial is warranted only when "it is impossible to know if the jury rejected the other theories advanced by plaintiff and rendered judgment based on th[e] improperly submitted theory." *Tobin v Providence Hospital*, 244 Mich App 626, 645; 624 NW2d 548 (2001). This situation occurs when the jury is asked to render a general verdict, which "is either all wrong or all right because it is an inseparable and inscrutable unit." *Id*. While a single error completely destroys a general verdict, a jury verdict is not destroyed when it is possible to conclusively establish that the verdict is based on a properly submitted theory. See *Zdrojewski v Murphy*, 254 Mich App 50, 64-65; 657 NW2d 721 (2003); *Tobin*, 244 Mich App at 646. For the specific purpose of avoiding the necessity of holding a new trial, our court rules allow both for a general verdict and for special verdicts. MCR 2.515. "The special verdict compels detailed consideration . . . [and] enables the public, the parties and the court to see what the jury really has done." *Sudul v Hamtramck*, 221 Mich App 455, 458-459; 562 NW2d 478 (1997) (quotation marks and citation omitted). As a practical matter, "[t]he special verdict enables errors to be localized so that the sound portions of the verdict may be saved and only the unsound portions be subject to redetermination through a new trial." *Id*. (quotation marks and citation omitted).

The jury's finding of liability with respect to the residents' application of excessive force to plaintiff's head or neck was sufficient to support the verdict, see *Zdrojewski*, 254 Mich App at 64-65, and Genesys is therefore unable to establish prejudice to support the necessity of a new trial. The jury was presented with multiple theories of liability, and *specifically* found that the Genesys residents' application of excessive lateral or downward traction on plaintiff's head or neck constituted negligence and supported an award of damages. The separation of plaintiff's theories of liability on the jury verdict form completely eliminates the potential for prejudicial error affecting the jury's decision regarding the properly submitted theory. Any error in the verdict is therefore confined to its unsound portions.

We also note that Genesys did not object to the use of a special verdict form. Genesys therefore anticipated and acquiesced to the sequestration of error. Indeed, at the hearing on Genesys's motion for a new trial, counsel for Genesys explicitly acknowledged that a new trial would not be warranted if the jury based their verdict on a properly submitted theory of liability. A party may not raise a challenge on appeal premised on an error to which he contributed by either plan or negligence. *People v Bosca*, 310 Mich App 1, 29; 871 NW2d 307 (2015).

Moreover, given the substantial evidence supporting the jury's finding of liability with regard to plaintiff's excessive traction theory, it is simply not likely that the admission of evidence of noncausal negligence had any effect on the outcome at trial. Dr. Plourd testified that "based on the specifics of this case," plaintiff's permanent brachial plexus injury was most likely caused by "excessive traction having been applied by some inexperienced physician."[9]

---

[9] As previously mentioned, Dr. Plourd's conclusion that plaintiff's injury was more than likely caused by an "inexperienced" physician further supports the relevancy of evidence pertaining to

-18-

According to Dr. Plourd, excessive lateral or rotational traction applied by an inexperienced physician during delivery is the "number one cause" of permanent brachial plexus injury, and while permanent brachial plexus injury can be caused by congenital defects, infections, or other abnormalities, no such factors were present here. Dr. Phung specifically testified that he applied traction to plaintiff's head at a "slight angle toward the ground." Given Dr. Plourd's observation that in situations involving shoulder dystocia it is never acceptable to angle an infant's head downward, Dr. Phung's testimony is tantamount to an admission of liability. Further, bruising on plaintiff's right cheek and forehead after delivery confirmed that excessive force had been applied in a downward fashion to plaintiff's head. It is highly unlikely, given the strength of the evidence to support Genesys' liability under plaintiff's excessive traction theory, that the jury relied on any evidence of the residents' noncausal negligent acts in reaching its conclusion on that theory. Any error in the trial court's admission of evidence regarding noncausal negligence was harmless, and not inconsistent with substantial justice.

## C. ERRONEOUS ADMISSION OF HEARSAY

Genesys next argues that it is entitled to a new trial because the trial court erroneously failed to exclude the admissions of Dr. Powers. Genesys argues that the admissions constituted inadmissible hearsay and prejudiced Genesys at trial. We disagree.

MRE 801(d)(2) provides that a statement is not hearsay if:

*Admission by Party-Opponent.* The statement is offered against a party and is (A) the party's own statement, in either an individual or a representative capacity, except statements made in connection with a guilty plea to a misdemeanor motor vehicle violation or an admission of responsibility for a civil infraction under laws pertaining to motor vehicles, or (B) a statement of which the party has manifested an adoption or belief in its truth, or (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship, or (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy on independent proof of the conspiracy.

When multiple defendants are involved in a case, the "admissions of one defendant are not admissible as substantive evidence against a codefendant." *Lenzo v Maren Engineering Corp*, 132 Mich App 362, 366; 347 NW2d 32 (1984).

At the time plaintiff published Dr. Powers' admissions to the jury, Dr. Powers was a defendant in the case. The admissions were therefore allowable as substantive evidence against Dr. Powers at the time they were entered. See MRE 802(d)(2); *Lenzo*, 132 Mich App at 362. Genesys argues that the trial court should have granted its motion for a mistrial once Dr. Powers

---

Dr. Starr and Dr. Phung's actions throughout Bryson's pregnancy, as these actions tend to illustrate the residents' lack of appropriate knowledge and experience.

was dismissed from the case because the admissions were no longer admissible evidence. However, Genesys cites no authority suggesting that the statements of Dr. Powers were erroneously admitted simply because she later was dismissed from the case, and this Court will not search for authority to sustain a party's position. *Patterson v Allegan Co Sheriff*, 199 Mich App 638, 640; 502 NW2d 368 (1993).

Moreover, any error arising from the admissions remaining part of the record was harmless. See *People v Rodriquez*, 216 Mich App 329, 332; 549 NW2d 359 (1996). When the admissions were first placed on the record, the trial court instructed the jury that it could only consider the admissions as evidence against Dr. Powers. We presume that jurors follow their instructions and that instructions cure most errors. *Zaremba Equip, Inc v Harco Nat'l Ins Co*, 302 Mich App 7, 25; 837 NW2d 686 (2013).

And although Genesys is correct that plaintiff's counsel should not have referenced Dr. Powers' admissions when examining Dr. Plourd, the references to Dr. Powers' admissions were fleeting. And in any event, Dr. Powers was called as a witness at trial and testified consistent with her admissions.[10] Genesys argues that it only called Dr. Powers as a witness at trial because the trial court erroneously allowed her statements in the first place, which required Genesys to call her to explain her answers. However, plaintiff explained that if the trial court had excluded the admissions, it would have called Dr. Powers as a live witness during its case-in-chief. Considering the circumstances as a whole, Genesys has not shown that the trial court erroneously allowed Dr. Powers' admissions, and to the extent any error occurred, it was harmless.

## C. IMPROPER USE OF LEARNED TREATISES

Genesys next argues that a new trial is required due to plaintiff's improper use of learned treatises throughout trial. We disagree.

MRE 707 provides:

> To the extent called to the attention of an expert witness upon cross-examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice, are admissible for impeachment purposes only. If admitted, the statements may be read into evidence but may not be received as exhibits.

"MRE 707 prohibits a learned treatise from being used to 'bolster' expert witness testimony on direct examination . . . ." *Hilgendorf v St John Hosp & Medical Ctr Corp*, 245 Mich App 670,

---

[10] For instance, Dr. Powers testified that if a resident had contacted her about any issue, she would have come to the hospital, stayed for the duration of Bryson's labor, and delivered the baby herself. She also testified that, although a C-section was not required, based on the information in the case, she would have offered Bryson that option.

701; 630 NW2d 356 (2001). The use of learned treatises is limited to impeachment purposes, as the admission of the material as substantive evidence would generally violate the rule against hearsay. *Stachowiak v Subczynski*, 411 Mich 459, 463; 307 NW2d 677 (1981).

Genesys first argues that plaintiff's counsel improperly used several medical articles to bolster Dr. Plourd's expert testimony. Genesys first cites the following passage during Dr. Plourd's testimony:

> *Q*. Do you have an opinion as to whether if [Dr. Powers] had been there, she would've been able to handle the situation and not tear the patient's brachial plexus?

> \* \* \*

> *A*. Yes. Indeed we alluded to in the literature, so separate from this case, there's data that says—

Before Dr. Plourd finished his answer, however, counsel for Genesys objected. The Court then rephrased the question, "Doctor, based upon your skill, knowledge, experience, education, and training, and the facts that you have been made aware of in this case, can you render an opinion on Mr. McKeen's question?" to which Dr. Plourd responded that the relative inexperience of a physician is a risk factor of brachial plexus injuries. This excerpt does not show a violation of MRE 707 because there was no description of a "statement" from a learned treatise that was allowed before Genesys objected and the trial court rephrased the question.

Next, Genesys points to an instance when plaintiff's counsel asked Dr. Plourd if he knew of a "large, prospective randomized trial in Sweden done by a woman named Marguerite Mollberg?" to which Dr. Plourd responded, "Yes." Plaintiff's counsel then asked if Dr. Plourd would regard the study as reliable, to which Dr. Plourd responded that he believed the study was a "powerful study by virtue of it being prospective" and stated that Mollberg's publications were generally reliable. However, when plaintiff's counsel asked Dr. Plourd about Mollberg's conclusions regarding the cause of brachial plexus injury in her study, Genesys' counsel objected before Dr. Plourd answered, and the court sustained the objection. No violation of MRE 707 therefore occurred because the trial court correctly prevented Dr. Plourd from testifying regarding the content of Mollberg's study. Simply asking a witness whether he or she is aware of a study and whether the study is reliable does not violate MRE 707.

Genesys argues that plaintiff also improperly used learned treatises on redirect examination to bolster Dr. Plourd's testimony. The testimonial excerpts referenced by Genesys primarily involve questions aimed at the limitations of the publications Genesys used to attempt to impeach Dr. Plourd's testimony on cross-examination and the differences between the publications cited by Genesys and the earlier editions of those same publications; plaintiff's counsel thus referenced the medical texts to allow Dr. Plourd to explain or respond to questions posed by Genesys during cross-examination. "[A] learned treatise may be used to rehabilitate an expert witness during redirect examination on subjects or issues related to that treatise used to impeach the expert during cross-examination." *Hilgendorf*, 245 Mich App at 706. Genesys has shown no violation of MRE 707 under the circumstances.

-21-

Genesys next argues that plaintiff's counsel violated MRE 707 by using medical literature to impeach the Genesys experts, but failed to establish some of the literature as reliable authority as required by MRE 707. At the close of trial, counsel for Genesys noted that a letter to the editor written by Dr. Spelsy, and a textbook written by O'Leary, were used to impeach defense witnesses, but were never established as reliable authority during the trial. The trial court instructed the jury on several occasions throughout trial that if a book or periodical was not established as reliable authority, it could not be used to undermine a witnesses' testimony. Immediately before the jury was sent to deliberate, the trial court again instructed it as follows:

> To the extent that a party has called the attention of a witness to publications, you may not consider that reference to those publications if they have not been established as reliable. Where publications were established to be reliable, you may use the statements quoted from those publications to evaluate a witness's in Court testimony to gauge its believability where the statements contradicted the witnesses. Okay?

> So, if a witness says one thing on the stand, an expert witness, and somebody says are you familiar with this book, yes I am. Is it a reliable book? Yes, it is. Well, doesn't it say in this book the opposite of what you just said? That would be the appropriate use of that book to make the witness's testimony less believable. Okay? If there has been no indication that the book is reliable, then the statements may not be used to contradict the expert on the witness stand.

> I know it's not going to be easy, but you've got to go back and think of what was determined to be reliable and what wasn't, okay, and if you can't it's okay. Just do your best. All right? But those are the rules on that.

This Court presumes that jurors follow their instructions and that instructions cure most errors occurring during trial. *Zaremba*, 302 Mich App at 26. Genesys argues that the trial court should have specifically identified the Spelsy letter to the editor and the O'Leary textbook in its instruction, but it cites no authority indicating that the trial court was required to do so. We therefore conclude that Genesys has not established error requiring reversal under the circumstances.

Finally, Genesys argues that plaintiff's counsel did not properly "impeach" the witnesses, but rather read excerpts of the medical literature supporting plaintiff's theory of the case and then asked the experts if they agreed with what was read, which in essence only bolstered plaintiff's case. Further, Genesys argues that plaintiff's counsel improperly referred to the articles as substantive evidence supporting plaintiff's theory during closing argument. To the extent error occurred in these circumstances, the trial court explained to the jury that it is impermissible to use a learned treatise to bolster a witness' opinion, and that the questions and arguments of the attorneys are not evidence. This Court presumes that the jury followed these instructions. *Zaremba*, 302 Mich App at 26.

## D. IMPROPER USE OF "REPTILE THEORY"

Genesys next argues that a new trial is warranted because plaintiff improperly used "reptile theory" throughout the case. Genesys explains that "reptile theory" is an effort to activate "a juror's brain into 'reptilian' survival mode" by suggesting that, regardless of other standards of care, doctors may not take "unnecessary risks" and must make the "safest available choice." Genesys cites to several instances at trial wherein plaintiff's counsel allegedly used "reptile theory."

The standard of care applicable to a specialist in a medical malpractice action is "that of a reasonable specialist practicing medicine in the light of present day scientific knowledge." *Naccarato v Grob*, 384 Mich 248, 254; 180 NW2d 788 (1970). "The applicable standard of care for general practitioners is that of the local community or similar communities, while the standard of care for a specialist is nationwide." *Cudnik v William Beaumont Hosp*, 207 Mich App 378, 383; 525 NW2d 891 (1995). Our Supreme Court has further recognized that claims imposing strict liability are "not cognizable in either ordinary negligence *or* medical malpractice." *Bryant v Oakpointe Villa Nursing Ctr, Inc*, 471 Mich 411, 426; 684 NW2d 864 (2004).

We agree that any argument by plaintiff that the Genesys residents did not act in the "safest" manner possible was improper because the standard of care applicable to specialists like the residents practicing obstetrics/gynecology at Genesys was not whether they acted in the "safest" manner possible, but whether they acted with a level of care that was below what a reasonable specialist in the nation would do in light of present day scientific knowledge. *Cudnik*, 207 Mich App at 383; *Naccarato*, 384 Mich at 254. Therefore, to the extent plaintiff's counsel elicited testimonial evidence suggesting a more stringent standard of care, the evidence was irrelevant to the issues the jury needed to decide at trial. See MRE 401; MRE 402.

The erroneous admission of evidence is subject to harmless error analysis; an error is harmless if it did not prejudice the opposing party. See *Rodriquez*, 216 Mich App 332. We conclude that any error regarding plaintiff's use of "reptile theory" was harmless. The references by plaintiff's counsel to "safety" and whether it was appropriate for a physician to "needlessly endanger" a patient in the context of Dr. Phung's, Dr. Davidson's, and Dr. Starr's testimony were limited and fleeting, particularly considering the length of the trial. Regarding the statements of plaintiff's counsel during closing argument, the trial court instructed the jury that the attorneys' questions and statements were not evidence, and the court instructed the jury that the applicable standard of care was as follows:

When I use the words, quote, professional negligence, end quote, or quote, malpractice, end quote, with respect to the defendant's conduct, I mean the failure to do something which an intern or resident in obstetrics and gynecology of ordinary learning, judgment, or skill in this community or in a similar one would do, or the doing of something which an intern or resident in obstetrics and gynecology of ordinary learning, judgment, or skill would not do under the same or similar circumstances you find to exist in this case. It is for you to decide upon the evidence what the intern or resident in the ordinary obstetrics and gynecology

-23-

of ordinary learning, judgment, or skill would do or would not do under the same or similar circumstances.

Again, this Court presumes that jurors follow their instructions and that instructions cure most errors. *Zaremba*, 302 Mich App at 26. Genesys has not shown prejudice under these facts.

### E. IMPROPER DESIGNATION OF DR. CHUGANI AS A DEFENSE EXPERT

Genesys next argues that a new trial is warranted because the trial court improperly admitted evidence that Dr. Chugani was previously an expert for Genesys, which bolstered plaintiff's case. In support, Genesys cites *Kissel v Nelson Packing Co*, 87 Mich App 1; 273 NW2d 102 (1979), in which this Court stated that "[t]estimony as to the expert's original employment is not pertinent to any issue presented, and neither party should be bound by the rejected opinions of experts employed by him to assist in evaluating his case." Genesys cites to Dr. Chugani's testimony in which he stated:

> *Q (Plaintiff's counsel)*. July 8th, you were contacted by Mr. Shimmel [counsel for Genesys], I should say sent a letter from Mr. Shimmel that was apparently subsequent to a telephone discussion and at that time he enclosed the plaintiff's Complaint, labor and delivery records, unspecified subsequent records of plaintiff minor, Asia, including records from the University of Michigan, Dr. Simmert, Hurley Medical Center and the deposition of Libbey Bryson. And he was trying to schedule an IME at that time, correct?
>
> *A*. Yes.
>
> *Q*. I should say so-called IME. And then Mr. Shimmel arranged for you to do a defense medical exam on August 11th, is that correct?
>
> *A*. Yes. I suppose so. I have the report.

Testimony that Dr. Chugani previously worked for Genesys was irrelevant to any of the issues presented at trial, but the erroneous admission of this evidence was clearly harmless. Dr. Chugani agreed during his deposition only that counsel for Genesys contacted him to "schedule an IME" and that he arranged for him to "do a defense medical exam." It was not clear from this testimony that Dr. Chugani had been retained as an expert for Genesys, and the reference was limited and fleeting. Genesys has not shown that the statement was prejudicial.

### F. TRIAL BY AMBUSH

Genesys next argues that a new trial is warranted because plaintiff carefully orchestrated a "trial by ambush" by introducing Dr. Powers' admissions, calling McEchian as a witness, introducing the testimony and new reports of Carruthers, and introducing a statement of medical costs after the close of proofs. Genesys cites no authority, other than cases stating that Michigan has a broad discovery policy intended to guard against surprise at trial. A party's failure to identify relevant authority and argue a position constitutes abandonment of the issue on appeal. *Oneida Twp v Eaton Co Drain Comm'r*, 198 Mich App 523, 526 n 2; 499 NW2d 390 (1993). An appellant may not merely announce its position and leave this Court to determine and

rationalize the basis for its claim. *Wilson v Taylor*, 457 Mich 232, 243; 577 NW2d 100 (1998). This issue is therefore abandoned on appeal.

In any event, Genesys has not shown that it is entitled to a new trial. Regarding Dr. Powers, the trial court explained that the parties had discussed the issue of her admissions at a settlement conference well before the start of trial, so there was no surprise to Genesys on the first day of trial when plaintiff sought to introduce the admissions. Regarding the medical statement, Genesys does not suggest that it was unaware such records existed, but rather argues that plaintiff should not have been allowed to present the statement after the close of proofs. Although the trial court should not have allowed the medical statement after the close of proofs, as we discuss later in this opinion, this error did not transform the trial into a trial by ambush.

Regarding the testimony of Carruthers and McEchian, this Court has explained that "[t]rial courts should not be reluctant to allow unlisted witnesses to testify where justice so requires, particularly with regard to rebuttal witnesses." *Pastrick v Gen Telephone Co*, 162 Mich App 243, 245; 412 NW2d 279 (1987). There is no specific list of conditions that must be met before the late endorsement of a witness is proper, but a trial court should set reasonable conditions to prevent prejudice and to enable the opposing party to prepare for the testimony of the new witness. *Id.* at 245-246. "[J]ustice is best served where an unlisted witness can be permitted to testify while the interests of the opposing party are adequately protected" because it gives the jury "a fuller development of the facts surrounding the case." *Id.* at 246.

In this case, McEchian was identified by plaintiff on the first and final witness lists. Genesys argues that he should have nonetheless been excluded from testifying at trial because a former attorney of plaintiff's allegedly informed counsel for Genesys that she would not call McEchian at trial. This conversation was never confirmed with plaintiff's current attorney. Even so, the trial court ruled that plaintiff could not call McEchian as the first witness to allow Genesys the opportunity to take his deposition. The trial court did not abuse its discretion by allowing McEchian to testify at trial under these conditions. [11]

Regarding Carruthers' testimony and life care reports, it was established well before trial that Forman, plaintiff's original life care planner, had been in a car accident and would be unable to testify at trial. Plaintiff's counsel originally asked the court to allow Forman's deposition testimony and report, but asked to add Carruthers as a witness after counsel for Genesys argued during opening statements that Forman's report was unreliable because it was incomplete. On a later day of trial, plaintiff's counsel explained that Genesys was aware of Carruthers well before trial due to ongoing discussion about how to handle Forman's accident, and that she was made available for a deposition, but Genesys chose not to depose her. Given the circumstances, we conclude that the trial court did not abuse its discretion by allowing Carruthers to testify at trial. Further, Carruthers' testimony was largely duplicative of Forman's deposition testimony that had already been presented to the jury, and her reports did not identify any greater damages than Forman's report. A new trial is not warranted on this basis.

---

[11] A trial court's decision to allow the late endorsement of a witness is reviewed for an abuse of discretion. *People v Gadomski*, 232 Mich App 24, 32; 592 NW2d 75 (1999).

## G.  INSTRUCTIONAL ERROR

Genesys next argues that the trial court improperly instructed the jury regarding M Civ JI 15.03 and improperly refused to instruct the jury regarding M Civ JI 30.04.  We conclude that no error requiring reversal occurred.

Jury instructions should include all the elements of the plaintiff's claims and should not omit material issues, defenses, or theories if the evidence supports them.  *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).  "Even if somewhat imperfect, instructions do not create error requiring reversal if, on balance, the theories of the parties and the applicable law are adequately and fairly presented to the jury."  *Id.*  Reversal for instructional error is limited to instances in which an improper instruction was inconsistent with substantial justice.  *Id.*

M  Civ JI 15.03 states,

There may be more than one proximate cause.  To be a proximate cause, the claimed negligence need not be the only cause nor the last cause.  A cause may be proximate although it and another cause act at the same time or in combination to produce the occurrence.

Genesys argues that this instruction was improper because "there was no evidence of more than one proximate cause" of plaintiff's injury.  At the time of trial, plaintiff asserted three different theories of negligence, which were all purportedly proximate causes of her injury: failure to earlier perform a C-section on the basis of plaintiff's non-reassuring strips, failure to earlier contact Dr. Powers to ensure an experienced physician was present at delivery, and application of excessive traction on plaintiff's head or neck during delivery.  Even excluding the first two improper theories, plaintiff's counsel argued that the evidence supported more than one proximate cause with regard to only the "excessive traction" theory.  He explained the following at the hearing on Genesys' motion for JNOV:

There can be more than one proximate cause in a case like this.  And the fact was that there were two causes, the forces of labor, that would be one cause, and also any traction applied by the physician.

At trial, Dr. Gherman testified as follows:

*Q*.  Even if you want to assume that there [is] some stretch in the brachial plexus, the exogenous forces of Phung or Starr could have led to an injury that otherwise wouldn't have occurred from a stretch or led to a permanent injury that might not have occurred, true?

*A*.  Well, ultimately if the actions of Starr and Phung were inappropriate, then yes, they could've exacerbated it.

Accordingly, Dr. Gherman testified that, even if the endogenous forces of labor were one cause of plaintiff's brachial plexus injury, Dr. Starr's and Dr. Phung's actions could have also contributed or exacerbated the injury if they applied excessive traction during delivery.  We therefore conclude that this instruction was appropriate.

-26-

Next, M Civ JI 30.04 states,

> There are risks inherent in medical treatment that are not within a doctor's control. A doctor is not liable merely because of an adverse result. However, a doctor is liable if the doctor is negligent and that negligence is a proximate cause of an adverse result.

At trial, plaintiff argued that the Genesys residents were negligent by applying excessive traction to plaintiff's head and neck after they encountered a shoulder dystocia during delivery. The mechanism of injury argued by plaintiff was therefore something completely within the physicians' control. By contrast, Genesys argued that plaintiff's injury was entirely the result of the endogenous forces of labor, and could not be attributed to any actions, or "treatment" of Dr. Starr and Dr. Phung. Because this instruction is only applicable to risks related to treatment but not within the doctor's control, it was inconsistent with either party's theory of liability at trial. Genesys has not shown that instructional error occurred in this case.

## H.  PAST MEDICAL EXPENSES

Finally, Genesys argues that a new trial is required because the trial court allowed plaintiff to submit proof of past medical expenses after the close of proofs. Plaintiff's counsel explained that he "thought we'd stipulated [the past medical expenses] were coming into evidence." Counsel for Genesys disagreed that he had stipulated to the admission of plaintiff's past medical bills. The trial court and plaintiff's counsel stated that they talked about putting the medical bills into evidence, but the trial court noted that there "wasn't exact clarity on whether there was agreement or not." The court stated that it would nonetheless allow the bills because it would unnecessarily delay the case to attempt to bring in a witness to authenticate the medical records. The jury then awarded plaintiff $45,000 in past medical expenses.

In its motion for a new trial, Genesys again argued that the jury's award of past medical expenses was not supported by any evidence plaintiff submitted before the close of proofs. At the motion hearing, the trial court ruled as follows:

> Well, I'm going to make a contingent ruling. The transcript speaks for itself. If it came in either evidentiary presentation, then the $45,000 stays. If it came in in closing argument, then I'm vacating it as not being appropriately enter[ed].

At a subsequent hearing over a year later, the trial court explained that the issue of whether plaintiff had offered any evidence regarding the past medical expenses before the close of proofs had not yet been resolved. The trial court agreed to leave the award of $45,000 in the judgment to resolve the issue and to facilitate an appeal.

On appeal, Genesys again argues that the jury's award of $45,000 for plaintiff's past medical expenses was unsupported by any evidence properly submitted before the close of proofs. We agree. A plaintiff asserting damages bears the burden of proving the damages alleged. *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001). Although plaintiff and the trial court suggested near the end of trial on the record that the parties had discussed the admission of plaintiff's past medical bills, counsel for Genesys asserted that he did

not stipulate to the records and the trial court agreed that it was not clear whether there was an agreement between the parties. The record does not support that the trial court allowed the admission of plaintiff's past medical bills before the close of proofs, or that counsel for Genesys ever stipulated to their admission during the case. Accordingly, this evidence was not properly presented to the jury. However, the appropriate remedy for this error is not a new trial, but rather removal of the $45,000 awarded for past medical expenses from the judgment.[12]

Consequently, the trial court's judgment is affirmed in all respects except regarding the $45,000 awarded to plaintiff for past medical expenses, which is reversed. Affirmed in part, reversed in part, and remanded for entry of an order consistent with this opinion. We do not retain jurisdiction.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Michael F. Gadola

---

[12] See *Cadwell v City of Highland Park*, unpublished opinion per curiam of the Court of Appeals, issued May 29, 2015 (Docket No. 318430).